*1022 OPINION
RYMER, Circuit Judge:
Claude Cassirer is an American citizen whose grandmother’s Pissarro painting was allegedly confiscated in 1939 by an agent of the Nazi government in Germany because she was a Jew. He filed suit in federal district court to recover the painting, or damages, from the Kingdom of Spain and the Thyssen-Bornemisza Collection Foundation, an instrumentality of Spain, which now claims to own the painting. Spain and the Foundation moved to dismiss, asserting, among other things, sovereign immunity pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602, et seq. The FSIA makes a foreign state immune from suit in the courts of the United States unless an exception applies. The district court denied the motions, Cassirer v. Kingdom of Spain, 461 F.Supp.2d 1157 (C.D.Cal.2006), and also denied motions to dismiss for lack of a case or controversy, personal jurisdiction, and proper venue. Spain and the Foundation appealed, raising most of these issues.
Cassirer relies on the “international takings” or “expropriation” exception in the FSIA that confers subject matter jurisdiction over a foreign state when “rights in property taken in violation of international law” are at issue; the property is owned “by an agency or instrumentality of the foreign state”; and the instrumentality “is engaged in a commercial activity in the United States.” 28 U.S.C. § 1605(a)(3). Spain and the Foundation maintain that this exception is not applicable because the painting was taken in violation of international law by Germany, not by either of them, and because the Foundation is not engaged in commercial activity in the United States sufficient to trigger the exception. Spain contends that Cassirer should have exhausted remedies in Germany or Spain, but failed to do so. Spain also contests the existence of a case or controversy, while the Foundation challenges the exercise of personal jurisdiction.
Our review is constrained because this is an appeal before final judgment has been entered. Generally, we may review only final decisions of a district court, but our jurisdiction also extends to a small category of collateral orders that are separate from the merits and can’t effectively be reviewed on appeal from a final judgment. A ruling that denies sovereign immunity is such an order. Consequently, we may hear the appeal taken from the district court’s order denying the motions to dismiss for lack of subject matter jurisdiction based on sovereign immunity. But its decision declining to dismiss the action for lack of personal jurisdiction and a case or controversy is fully reviewable on appeal after judgment. For this reason we have no appellate jurisdiction over these issues, and will dismiss the appeal as to them.
On the issue of sovereign immunity, we conclude that §. 1605(a)(3) does not require the foreign state against whom the claim is made to be the one that took the property. We are satisfied that the record supports the district court’s finding of a sufficient commercial activity in the United States by the Foundation. The statute does not mandate that the plaintiff exhaust local remedies for jurisdiction to lie, and we do not consider a prudential exhaustion analysis given our limited appellate jurisdiction. This being so, we will affirm the order that the expropriation exception applies such that the court has subject matter jurisdiction over the action as to both Spain and the Foundation.
I
The property at issue is an oil painting by the French impressionist master Camille Pissarro, Rue Saint-Honore, apres *1023 midi, effet de pluie.[1] It was completed in 1897 and sold in 1898 to Cassirer’s great-grandfather, Julius Cassirer, who lived in Germany. The painting remained in the family for some forty years, eventually passing to Lilly Cassirer, Cassirer’s grandmother, upon her husband’s death. She later remarried.
In 1939 Lilly decided she had no choice but to leave Germany. By that time — as the district court judicially noticed — German Jews had been deprived of their civil rights, including their German citizenship; [2] their property was being “Aryanized”; and the Kristallnacht pogroms had taken place throughout the country. Permission was required both to leave and to take belongings. The Nazi government appointed Munich art dealer Jakob Scheidwimmer as the official appraiser to evaluate the works of art, including the Pissarro painting, that Lilly wished to take with her. Scheidwimmer refused to allow her to take the painting out of Germany and demanded that she hand it over to him for approximately $360. Fearing she would not otherwise be allowed to go, and knowing she would not actually get the money because the funds would be paid into a blocked account, Lilly complied.
Scheidwimmer traded the painting to another art dealer, who was also persecuted and fled Germany for Holland. After Germany invaded Holland, the Gestapo confiscated the painting and returned it to Germany, where it was sold at auction to an anonymous purchaser in 1943. It turned up at a New York gallery in 1952 and was sold to a St. Louis collector; it was sold again in 1976 to a New York art dealer who, in turn, sold it to Baron Hans-Heinrich Thyssen-Bornemisza. Bornemisza lived in Switzerland and was a preeminent private collector.
In 1988, Spain paid the Baron $50 million to lease his collection for ten years. Five years into the lease, Spain paid the Foundation $327 million to purchase the entire collection, including the Pissarro painting. As part of the agreement, Spain provided the Villahermosa Palace in Madrid to the Foundation, free of charge, for use as the Thyssen-Bornemisza Museum.
Claude Cassirer, Lilly’s heir, discovered in 2000 that the painting was on display at the Thyssen-Bornemisza Museum in Madrid. He asked Spain’s Minister for Education, Culture and Sports, who was chair of the Foundation’s board, to return it. The request was refused. In 2003, five members of Congress wrote the Minister requesting return of the painting; this request, too, was rejected. Cassirer did not try to obtain the painting through judicial proceedings in Spain, or to pursue other remedies in Spain or Germany, before bringing suit in the United States.
He filed this action against the Foundation and Spain in the Central District of California on May 10, 2005. The complaint avers that Germany confiscated the painting based on Lilly’s status as a Jew and as part of its genocide against Jews; hence the taking was in violation of international law. It alleges that the Foundation is engaged in numerous commercial activities in the United States that include *1024 borrowing art works from American museums; encouraging United States residents to visit the museum and accepting entrance fees from them; selling various items to United States citizens including images of the painting; and maintaining a web site where United States citizens may buy admission tickets using United States credit cards and view the paintings on display, including Rue Saint-Honore, apres-midi, effect de pluie. The complaint seeks imposition of a constructive trust and return of the painting or, alternatively, recovery of damages for conversion.
The Foundation filed a motion to dismiss based on lack of subject matter and personal jurisdiction, and improper venue. Spain followed with its own motion to dismiss. The district court allowed Cassirer to conduct jurisdictional discovery into the Foundation’s commercial activity in the United States. Both motions were then denied. The court certified the matter for interlocutory appeal under 28 U.S.C. § 1292(b), though Spain and the Foundation abjured this route in favor of appeal on the basis of the collateral order doctrine.
In this court, Cassirer filed a motion to dismiss as to issues other than those pertaining to sovereign immunity on the ground that appellate jurisdiction is lacking.[3] The original panel agreed that the district court’s denial of motions to dismiss for lack of personal jurisdiction and case or controversy is not immediately appealable as a collateral order. Cassirer v. Kingdom of Spain, 580 F.3d 1048, 1054-55 (9th Cir.2009). The panel held that § 1605(a)(3) does not require Spain to be the entity that expropriated the painting in violation of international law, and that the Foundation, which owns the painting, engaged in sufficient commercial activity in the United States to satisfy the FSIA. It further held that exhaustion is not statutorily required; however, a majority concluded that the district court erred in failing to conduct a prudential exhaustion analysis, and remanded for it to do so. We decided to rehear the case en banc. Cassirer v. Kingdom of Spain, 590 F.3d 981 (9th Cir.2009).[4]
II
We must consider the bounds of our appellate jurisdiction at the outset. By statute, 28 U.S.C. § 1291, we have jurisdiction to review “final decisions” of the district court. A final decision is one that ends the litigation on the merits, Am. States Ins. Co. v. Dastar Corp., 318 F.3d 881, 884 (9th Cir.2003), which no decision that is before us does. Still, we may review “a small category of decisions that, although they do not end the litigation, must nonetheless be considered ‘final.’ ” Swint v. Chambers County Comm’n, 514 U.S. 35, 42, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995) (quoting Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). “That small category includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action.” Id.
It is well settled that sovereign immunity is within this small category of *1025 cases from which an immediate appeal will lie. See, e.g., Gupta v. Thai Airways Int'l, Ltd., 487 F.3d 759, 763-65 (9th Cir.2007); In re Republic of the Philippines, 309 F.3d 1143, 1148-49 (9th Cir.2002). The point of immunity is to protect a foreign state that is entitled to it from being subjected to the jurisdiction of courts in this country, protection which would be meaningless were the foreign state forced to wait until the action is resolved on the merits to vindicate its right not to be in court at all. Thus, we have jurisdiction to review the district court’s order denying sovereign immunity.
The same is not true of the court’s orders denying motions to dismiss for lack of a case or controversy and personal jurisdiction. Van Cauwenberghe v. Biard, 486 U.S. 517, 526-27, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988), and Batzel v. Smith, 333 F.3d 1018, 1023 (9th Cir.2003), both recognize that denial of a motion to dismiss for lack of personal jurisdiction is neither a final decision nor appealable under the collateral order doctrine. The FSIA presents a novel situation, however, in that personal jurisdiction over a foreign state exists under the statute if it is not immune and if proper service has been made. 28 U.S.C. § 1330(b); Altmann, 317 F.3d at 969. Because the one follows from the other, the rulings arguably are so related that we should consider extending our collateral order jurisdiction over sovereign immunity to resolve personal jurisdiction as well. See Swint, 514 U.S. at 50-51, 115 S.Ct. 1203(discussing but not deciding whether a court of appeals with jurisdiction over one ruling can review related rulings that are not themselves independently reviewable). We see no reason to do so here, for the decision points are different.
The Foundation argues that exercising personal jurisdiction offends due process. To resolve this argument, we would need to decide whether a foreign state or an instrumentality of a foreign state is a “person” for purposes of the Due Process Clause, whether the FSIA incorporates the requirements of “minimum contacts,” and whether the Foundation has sufficient minimum contacts with the United States to support general or specific jurisdiction. Its stance on sovereign immunity, on the other hand, turns on whether the takings exception applies only to a foreign state that has itself taken property in violation of international law, and whether the Foundation has engaged in a commercial activity in the United States. In short, a decision that a foreign state is not entitled to sovereign immunity under the FSIA is not “inextricably intertwined” with a decision that the exercise of personal jurisdiction comports with due process. See id. at 51, 115 S.Ct. 1203. Therefore, we decline to expand our collateral order jurisdiction to append review of the latter to the former.
Although we have not previously addressed whether denial of a motion to dismiss for lack of a case or controversy is an immediately appealable collateral order, other circuits have indicated that questions of standing, case or controversy, and ripeness are, like the question of personal jurisdiction, not immediately appealable. See, e.g., Moniz v. City of Fort Lauder-dale, 145 F.3d 1278, 1281 n. 3 (11th Cir.1998) (standing); Triad Assocs., Inc. v. Robinson, 10 F.3d 492, 496-97 n. 2 (7th Cir.1993) (same); Crymes v. DeKalb County, 923 F.2d 1482, 1484 (11th Cir.1991) (ripeness); Shanks v. City of Dallas, 752 F.2d 1092, 1098 n. 9 (5th Cir.1985) (ease or controversy and standing); City of Detroit v. Grinnell Corp., 495 F.2d 448, 474-75 (2d Cir.1974) (ripeness and standing), abrogated on other grounds by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir.2000). We routinely consider these issues *1026 on appeal from a final judgment, see, e.g., Oregon v. Legal Servs. Corp., 552 F.3d 965, 969 (9th Cir.2009), and are not persuaded that the district court’s order refusing to dismiss this action for lack of a case or controversy should be immediately appeal-able. While a favorable ruling would remove Spain from the lawsuit just as immunity would do, so too would prevailing on a myriad of other pretrial motions. Achieving an effectively similar result is no reason to bring denial of such motions within the “small category” of decisions that merit immediate review, otherwise the category would be small no longer.
Accordingly, we have no appellate jurisdiction to review the district court’s denial of motions to dismiss for lack of personal jurisdiction and a case or controversy.
III
As both the Supreme Court and we have explained the genesis of the FSIA at length, see Republic of Austria v. Altmann, 541 U.S. 677, 688-91, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004); Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 486-89, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 705-06(9th Cir.1992), we will not do so again except to say that in 1976, Congress codified the “restrictive principle” of sovereign immunity with “a comprehensive statute containing a ‘set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.’ ” Altmann, 541 U.S. at 691, 124 S.Ct. 2240 (quoting Verlinden, 461 U.S. at 488, 103 S.Ct. 1962). The “restrictive principle,” then embraced by most nation states, recognized immunity for public acts, that is to say, acts of a governmental nature typically performed by a foreign state, but not for acts of a private nature even though undertaken by a foreign state. Commercial activity is a good example of conduct that would ordinarily be engaged in by a private entity. If a foreign state is not entitled to immunity, then it is liable on claims for relief just like a private individual. 28 U.S.C. § 1606.
“The language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality ....” First Nat’l City Bank v. Banco Para El Comercio, 462 U.S. 611, 620, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983); H.R.Rep. No. 94-1487, at 12 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604, 6610(“The bill is not intended to affect the substantive law of liability.”).[5] Put differently, the FSIA simply limits the jurisdiction of American courts to hear claims against foreign states. It creates no cause of action.
Sovereign immunity is a threshold issue because it goes to the court’s subject matter jurisdiction. It is a question of law that we review de novo, although to the extent informed by factual findings made by the district court, those findings are reviewed for clear error.
Under the statutory scheme, a district court has subject matter jurisdiction over claims against a foreign state with respect to which the foreign state is not entitled to immunity. 28 U.S.C. § 1330(a).[6] A foreign state is immune except as specified in *1027 the FSIA. 28 U.S.C. § 1604.[7] The FSIA has a number of exceptions,[8] but Cassirer invokes only the “expropriation” exception in § 1605(a)(3). Section 1605(a)(3) provides that a foreign state is not immune in any case
in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]
So far as the first condition is concerned, a taking offends international law when it does not serve a public purpose, when it discriminates against those who are not nationals of the country, or when it is not accomplished with payment of just compensation. See Siderman, 965 F.2d at 711-12; West v. Multibanco Comermex, S.A., 807 F.2d 820, 831-33(9th Cir. 1987). As we noted in Siderman, both the House Report on the FSIA and the Restatement of Foreign Relations Law reflect a similar understanding.[9] “At the jurisdictional stage, we need not decide whether the taking actually violated international law; as long as a ‘claim is substantial and non-frivolous, it provides a sufficient basis for the exercise of our jurisdiction.’ ” Siderman, 965 F.2d at 711(quoting West, 807 F.2d at 826). On appeal, neither Spain nor the Foundation contends that Germany’s actions with respect to the painting were not a taking in violation of international law.
So far as the commercial activity prong is concerned, just the second clause is pertinent here as there is no dispute the painting is not “present in the United States.” Thus, there is jurisdiction under § 1605(a)(3) if the Foundation, which admittedly owns the painting and concedes it is an instrumentality of Spain for purposes of the statute, “is engaged in a commercial activity in the United States.” “A ‘commercial activity’ means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.” 28 U.S.C. § 1603(d).
With this by way of background, we turn to the questions that are dispositive here: whether § 1605(a)(3) covers a claim *1028 against Spain and the Foundation when neither was the foreign state that took the painting in violation of international law; whether the Foundation is engaged in a sufficient commercial activity in the United States; and whether exhaustion of remedies is required as a prerequisite to jurisdiction.
A
The Foundation’s lead point, joined by Spain, is that the takings exception applies only to the foreign state that expropriated the property and not to some later purchaser who was not complicit in the taking. More specifically, the Foundation contends that because the language of § 1605(a)(3) does not identify the taker, the text can as easily be read to imply a taking “by the foreign state” as a taking “by any foreign state.”
We agree with the district court that the plain language of the statute does not require that the foreign state against whom the claim is made be the entity which took the property in violation of international law. Section 1605(a)(3) simply excepts from immunity “a foreign state” in any case “in which rights in property taken in violation of international law are in issue.” (emphasis added). The text is written in the passive voice, which “focuses on an event that occurs without respect to a specific actor.” Dean v. United States, — U.S. —, 129 S.Ct. 1849, 1853, 173 L.Ed.2d 785 (2009) (so , observing with respect to the phrase “if the firearm is discharged”); see Watson v. United States, 552 U.S. 74, 80-81, 128 S.Ct. 579, 169 L.Ed.2d 472 (2007) (noting that use of the phrase “to be used” reflects “agnosticism ... about who does the using”). Thus, the text already connotes “any foreign state.” It would have to be rewritten in order to carry the meaning the Foundation ascribes to it. That is, the statute would need to say that a foreign state is not immune in a case “in which rights in property taken by the foreign state in violation of international law are in issue.”
In the normal event our task is over when a statute is clear on its face. Zuni Pub. Sch. Dist. No. 89 v. Dep’t of Educ., 550 U.S. 81, 93, 127 S.Ct. 1534, 167 L.Ed.2d 449 (2007). The rule is no different with the FSIA. See, e.g., Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd., 475 F.3d 1080, 1087-88 (9th Cir.2007) (“In interpreting the FSIA, we first look to the plain meaning of the language employed by Congress.” (internal quotation marks and citation omitted)); Phaneuf v. Republic of Indonesia, 106 F.3d 302, 308 (9th Cir.1997) (observing in an FSIA case that “[w]e assume ... ‘the ordinary meaning of [the statutory] language accurately expresses the legislative purpose’ ” (quoting Export Group v. Reef Indus., Inc., 54 F.3d 1466, 1473 (9th Cir.1995))). Thus, we take the plain meaning of the text to be the meaning that Congress intended. As the words and grammatical construct in § 1605(a)(3) are clear, we understand that Congress meant for jurisdiction to exist over claims against a foreign state whenever property that its instrumentality ends up claiming to own had been taken in violation of international law, so long as the instrumentality engages in a commercial activity in the United States.[10]
*1029 Although the Foundation argues that evolution of the takings exception undermines this interpretation, it points to nothing in the legislative history which “clearly indicates that Congress meant something other than what it said.” Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 877(9th Cir.2001) (describing the standard) (internal quotation marks omitted). Instead, relying on two Fifth Circuit decisions, Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation, 730 F.2d 195, 204(5th Cir.1984), and de Sanchez v. Banco Central de Nicaragua, 770 F.2d 1385, 1395 (5th Cir.1985), and § 455 of the Restatement (Third), it claims that courts and commentators have long understood that the exception applies only to states that have done the taking. Vencedora was concerned with whether Algeria or an Algerian-owned corporation that had towed an abandoned vessel “owned or operated” it; in that context, the court stated that the legislative history of the FSIA indicates that § 1605(a)(3) was intended to reach any foreign agency that expropriated property or is using expropriated property taken by another branch of the foreign state. 730 F.2d at 204 (citing 1976 U.S.C.C.A.N. 6604, 6618).[11] The court held that the Algerian-owned corporation did not assume control of the vessel for the benefit of the Algerian government. Vencedora thus speaks to a different issue; the court had no occasion to comment on whether the taker and the defendant must be the same. The statement upon which the Foundation relies does not, in any event, say the opposite; that is, it does not say that § 1605(a)(3) applies only to the state that has done the wrongful expropriating. de Sanchez does nothing more than quote Vencedora.[12] Neither persuades us that Congress clearly meant something *1030 other than what it said in § 1605(a)(3). Nor does the Restatement,[13] which paraphrases what the FSIA provides but sheds no light on congressional intent.
Our reading of the text is buttressed by the articulated purpose of the FSIA to immunize foreign states for their public, but not for their commercial, acts. As Congress declared: “Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned.” 28 U.S.C. § 1602(Findings and Declaration of Purpose). Consistent with this purpose, § 1605(a)(3) restricts jurisdiction over an entity of a foreign state that owns property taken in violation of international law to those engaged in commercial activity in the United States. No other restriction is manifest.[14]
The Foundation asks us to compare § 1605(a)(3) with § 1605(a)(4), which is known as the “succession” exception, and to follow how we construed that exception in Republic of Philippines, 309 F.3d at 1150-51. Section 1605(a)(4) exempts a foreign state from immunity in any case “in which rights in property in the United
States acquired by succession ... are in issue.” As the Foundation points out, the word “acquired” is not followed by the phrase “by the foreign state,” yet this is the meaning we gave to the exception in Republic of Philippines. In that case, creditors of the Estate of Ferdinand E. Marcos sought to collect Marcos assets held by Merrill Lynch; Merrill Lynch filed an interpleader action to resolve conflicting claims, naming, among possible claimants, the Republic of the Philippines. The Republic asserted sovereign immunity; the creditors relied on the succession exception even though the Republic had not acquired any right in the assets by succession. The creditors argued that jurisdiction nevertheless attached because the statute requires only that rights acquired by succession be in issue, not necessarily the rights of the sovereign. We concluded that the exception applies only when the foreign state’s interest is as a successor to a private party. In so doing, we relied in part on legislative history which explains that immunity may not be claimed under this exception when the suit against the foreign state relates to property that it has *1031 obtained by gift or inheritance and that is located or administered in the country where suit is brought, because in this capacity — asserting rights in an estate— “ ‘the foreign state claims the same right which is enjoyed by private persons.’ ” Id. at 1151 (quoting H.R.Rep. No. 94-1487, at 20, 1976 U.S.C.C.A.N. 6604, 6619). In other words, to conform to the FSIA’s declared purpose, we read § 1605(a)(4) as exempting a foreign state only if it were claiming rights as a successor because it is only in that role that it is acting like a private person. By contrast, § 1605(a)(3) on its face confers jurisdiction over a foreign state only if the foreign state that is sued claims to own illegally confiscated property and acts like a private person by engaging in a commercial activity in the United States. Section 1605(a)(3), therefore, is already consonant with the purpose of the FSIA.
Finally, the Foundation posits that bizarre consequences unintended by Congress will occur if § 1605(a)(3) is interpreted as granting jurisdiction against foreign entities regardless of who did the expropriating or when, and regardless of whether the defendant was a good faith purchaser.[15] We cannot say whether floodgates might open, but in any event, jurisdictional boundaries are for Congress to set, not for courts to write around. This said, restraints are in place that deflect the risk. The FSIA is purely jurisdictional; it doesn’t speak to the merits or to possible defenses that may be raised to cut off stale claims or curtail liability. In addition, the statute constrains its own reach by restricting jurisdiction to rights in property, taken in violation of international law, that is now in the hands of a foreign state or its instrumentality, when that instrumentality is engaged in a commercial activity in the United States. And decisional law further limits the universe of potential claimants, for instance, by excluding nationals of the expropriating country from the scope of § 1605(a)(3). See, e.g., Siderman, 965 F.2d at 711; Chuidian, 912 F.2d at 1105.[16]
In sum, the statute states that the property at issue must have been “taken in violation of international law.” It does not state “taken in violation of international law by the foreign state being sued.” The legislative history does not clearly indicate that Congress meant something other than what it said. Indeed, the text would have *1032 to be redrafted to say what the Foundation wishes it said. For these reasons, we conclude that § 1605(a)(3) does not require that the foreign state against whom suit is brought be the foreign state that took the property at issue in violation of international law.[17]
B
The Foundation maintains that its activities in the United States are de minimis, and lack the requisite connection to the property in question. It submits that the district court incorrectly held that the activity need not be “commercial” in the ordinary sense, or be related to the expropriated property, or be substantial.
It is clear that activity need not be motivated by profit to be commercial for purposes of the FSIA. Joseph v. Office of the Consulate Gen. of Nigeria, 830 F.2d 1018, 1024(9th Cir.1987). As § 1603(d) provides, the commercial character of an activity depends on its nature rather than its purpose. Thus, it does not matter that the Foundation’s activities are undertaken on behalf of a non-profit museum to further its cultural mission. See Sun v. Taiwan, 201 F.3d 1105, 1107-08 (9th Cir.2000) (holding that Taiwan’s promotion and operation of a cultural tour was commercial activity despite being free and having been done to foster understanding). The important thing is that the actions are “the type of actions by which a private party engages in trade and traffic or commerce.” Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (internal quotation marks omitted); Siderman, 965 F.2d at 708(“The central question is ‘whether the activity is of a kind in which a private party might engage.’ ” (quoting Joseph, 830 F.2d at 1024)).
After allowing jurisdictional discovery on the issue, the district court found that the Foundation engages in commercial activities in the United States that include: buying books, posters, and post cards; purchasing books about Nazi expropriation of works of art; selling posters and books, and licensing reproductions of images; paying United States citizens to write for exhibit catalogs; shipping gift shop items to purchasers in the United States, including a poster of the Pissarro painting; recruiting writers and speakers to provide services at the museum; permitting a program to be filmed at the museum that included the Pissarro painting and was shown on Iberia Airlines flights between Spain and the United States; placing advertisements in magazines distributed in the United States, and sending press releases, brochures, and general information to Spain’s tourism offices in the United States, at least one of which mentions the Pissarro by name; distributing the museum bulletin, “Perspectives,” to individuals in the United States; borrowing and loaning artworks, though not the painting; and maintaining a website through which United States citizens sign up for newsletters, view the collection — including the Pissarro painting — and purchase advance admission tickets through links to third-party vendors. Cassirer, 461 F.Supp.2d at 1173-75. These findings are supported in the record and are not clearly erroneous.[18]
*1033 The Foundation faults the district court for having failed to require a nexus between the activity and the lawsuit, as well as a quantum of activity that has a substantial connection with the United States. It suggests that Congress meant to meld traditional concepts of personal jurisdiction with subject matter jurisdiction under the FSIA. However, the second clause of § 1605(a)(3) contains no requirement that a lawsuit arise out of specific activity having to do with the property in the United States, that is, there is no express analogue to the traditional doctrine of specific jurisdiction, nor does it explicitly require any particular level of activity or conduct commensurate to that normally contemplated for general jurisdiction. In this, § 1605(a)(3) differs from the “commercial activity” exception in § 1605(a)(2), which does provide that a foreign state is not immune from jurisdiction where “the action is based upon a commercial activity carried on in the United States by the foreign state” or upon an act committed elsewhere that “causes a direct effect in the United States.” See, e.g., Gates v. Victor Fine Foods, 54 F.3d 1457, 1463(9th Cir.1995) (applying § 1605(a)(2) and indicating the focus for purposes of the “commercial activity” exception is on specific acts that form the basis of the suit). The difference between the two exceptions shows that Congress knew how to draw upon traditional notions of personal jurisdiction when it wanted to, and did.[19] Beyond this, the statute says nothing particularly helpful about what constitutes “a” commercial activity that is either a “regular course of commercial conduct” or a “particular commercial transaction or act.” Instead, Congress left it to the courts to flesh out on a case-by-case basis.
We have considered the question before. In Siderman, we concluded that the Sidermans’ allegations concerning Argentina’s solicitation and entertainment of American guests at an expropriated hotel and the hotel’s acceptance of American credit cards and traveler’s checks were sufficient at the jurisdictional stage to show that Argentina was engaged in a commercial activity in the United States. 965 F.2d at 712. In Altmann, we likewise held that the Gallery, which was an instrumentality of the Austrian government and owned the Klimt paintings allegedly confiscated from the plaintiffs family, engaged in a commercial activity in the United States. This was based on allegations (assumed to be true) that the Gallery authored, edited and published in the United States a book about the women in Klimt paintings and a guidebook with photographs of the stolen paintings; and it advertised Gallery exhibitions in this country. 317 F.3d at 969. The publication and sale of these materials, and marketing of a Klimt exhibition in the United States, were commercial activities in themselves, and also were a means of attracting Americans to the Gallery.
Here, the Foundation has had many contacts with the United States, including some that encourage Americans to visit the museum where the Pissarro is fea *1034 tured, and some that relate to the painting itself. While the Foundation engaged in somewhat more activity in the United States than sufficed in Siderman and somewhat less than occurred in Altmann, we cannot say its endeavors fall short of being a commercial activity for jurisdictional purposes under the second prong of § 1605(a)(3).
C
Spain proposes that Cassirer was required to exhaust judicial remedies available in Germany or Spain before suing in the United States under the expropriation exception.[20] It particularly objects to the district court’s use of the exclusio unius doctrine to infer from the presence of an exhaustion requirement in § 1605(a)(7)— enacted in 1996 — but the absence of one in § 1605(a)(3) — enacted in 1976 — that Congress intended not to include an exhaustion requirement in § 1605(a)(3).[21] We recognize that extrapolating congressional intent for an earlier-enacted statute from a later-enacted statute is problematic. See, e.g., Cipollone v. Liggett Group, Inc., 505 U.S. 504, 520, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (questioning whether the intent of an earlier Congress can be inferred from the views of a subsequent one). We do not do so here; rather, we rely on the plain language of § 1605(a)(3) which contains no exhaustion requirement. This was the district court’s primary conclusion, and it is one with which we agree.
“Where Congress specifically mandates, exhaustion is required. But where Congress has not clearly required exhaustion, sound judicial discretion governs.” McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (internal citations omitted), superseded by statute on other grounds as stated in Booth v. Churner, 532 U.S. 731, 739, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). The expropriation exception says nothing at all about exhaustion of remedies. It does not, for example, condition immunity on a claimant’s having first presented his claim to the courts of the country being sued, or to the courts of the country that did the taking, or to any international tribunal. Spain identifies no language in the FSIA that would obligate Cassirer to exhaust. It follows that exhaustion is not a statutory prerequisite to jurisdiction.[22]
Neither does Spain point to anything in the legislative history that clearly indicates Congress meant to impose any such obligation. To the contrary, Congress intended to create a comprehensive, and exclusive, set of legal standards governing claims of immunity in every civil action against a foreign state.[23] As the preface *1035 to the House Report’s section-by-section analysis indicates, the FSIA “sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States.” H.R.Rep. No. 94-1487, at 12, 1976 U.S.C.C.A.N. 6604, 6610 (emphasis added). Further, the Report states, “[t]he purpose of the [FSIA] is to provide token and koto parties can maintain a lawsuit against a foreign state ... in the courts of the United States.” Id. at 6 (emphasis added). These objectives would be undercut were courts to read requirements into the statute that Congress itself has not clearly prescribed.
Spain nevertheless commends us to the views on exhaustion in Greenpeace, Inc. (U.S.A.) v. State of France, 946 F.Supp. 773, 782-84 (C.D.Cal.1996); Millicom Int’l Cellular v. Republic of Costa Rica, 995 F.Supp. 14, 23 (D.D.C.1998); and Justice Breyer’s concurrence in Altmann, 541 U.S. at 714, 124 S.Ct. 2240. We are not, however, persuaded they are apposite.
Greenpeace involved seizure of a ship, and held that the claimant could not complain that a taking or other economic injury has not been fairly compensated — and so violates international law- — unless the claimant had first exhausted domestic remedies in the foreign state that allegedly caused the injury. Millicom involved anti-competitive activity but relied on Greenpeace for the same rule. Cassirer’s jurisdictional theory is different, however; he asserts that the taking was in violation of international law because it was part of Germany’s genocide against Jews.[24]
Altmann is no more on point. The issue of exhaustion was not raised on appeal to *1036 our court and the Supreme Court did not grant certiorari on any issue other than whether the FSIA applied to claims that arose before it was enacted. The Court held that it did, rejecting the dissent’s concern that doing so would open foreign nations to vast liability for expropriation claims that occurred long ago. Responding to the same concern, Justice Breyer mentions several principles that might prevent this from happening, among them, “a plaintiff may have to show an absence of remedies in the foreign country sufficient to compensate for any taking.” [25] 541 U.S. at 714, 124 S.Ct. 2240. Justice Breyer’s comment does not bear on the existence of mandatory statutory exhaustion for, as he says, an absence of remedies may need to be shown and a plaintiff who litigates in the United States in disregard of remedies in the expropriating nation “may have trouble showing a ‘tak[ing] in violation of international law.’ ” Id. (quoting § 1605(a)(3))(emphasis added). Thus, we do not read his concurrence as intimating that § 1605(a)(3) statutorily mandates exhaustion for jurisdiction to lie.[26]
This brings us to Sarei v. Rio Tinto, PLC, 550 F.3d 822 (9th Cir.2008) (en banc), which was rendered after the district court’s decision in this case and in which we discussed whether prudential exhaustion should apply to claims under the Alien Tort Statute (ATS).[27] There, residents of Papua New Guinea alleged various crimes against humanity and environmental torts arising out of Rio Tinto’s mining operations in Papua New Guinea. Recognizing that the Supreme Court had signaled in Sosa v. Alvarez-Machain, 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), that a prudential or judicially-imposed exhaustion requirement “would certainly” be considered in an appropriate case under the ATS, we held that Sarei was such a case. However, neither Sosa nor Sarei offers any basis for reading a mandatory exhaustion requirement into § 1605(a)(3). Both the Supreme Court in Sosa and we in Sarei were discussing prudential, or discretionary, ex *1037 haustion, not statutory or mandatory exhaustion that may condition jurisdiction. Unlike statutory exhaustion, which, if clearly imposed by Congress, is mandatory and may also be jurisdictional, “[jjudicially-imposed or prudential exhaustion is not a prerequisite to the exercise of jurisdiction, but rather is ‘one among related doctrines- — -including abstention, finality, and ripeness — that govern the timing of federal-court decisionmaking.’ ” Sarei 550 F.3d at 828 (quoting McCarthy, 503 U.S. at 144, 112 S.Ct. 1081).
For this reason, we do not consider whether exhaustion may apply to the claims asserted in this case. We have answered the question before us — whether Spain is entitled to sovereign immunity under the FSIA. Necessarily, to do so we had to decide whether exhaustion is a statutory prerequisite to jurisdiction. We have determined that it is not: the expropriation exception does not mandate exhaustion. The district court went no further, nor do we. See Burlington N. & Santa Fe Ry. Co. v. Vaughn, 509 F.3d 1085, 1088 (9th Cir.2007) (deciding claim of tribal sovereign immunity on interlocutory appeal but declining to exercise jurisdiction over a claim based on denial of exhaustion of tribal remedies); cf. Lauro Lines s.r.l. v. Chasser, 490 U.S. 495, 501, 109 S.Ct. 1976, 104 L.Ed.2d 548 (1989) (rejecting immediate appeal from an interlocutory order denying a motion to dismiss based on a forum non conveniens clause because a claim that a party may only be sued in a particular forum is vindicable on appeal after final judgment).
In conclusion, § 1605(a)(3) does not require local remedies to be exhausted before a court may determine whether subject matter jurisdiction exists, i.e., whether a foreign state is immune from suit. As the statutory criteria are met, the expropriation exception applies to Spain. We express no opinion beyond this. Undoubtedly, Spain and the Foundation will pursue numerous defenses, but these are beyond the scope of our present jurisdiction. We simply hold that the district court has power to entertain Cassirer’s claim against Spain as well as the Foundation.
IV

Conclusion

Having determined that our appellate jurisdiction does not extend to the district court’s denial of motions to dismiss for lack of personal jurisdiction and a case or controversy, we dismiss the appeal as to these issues.
We conclude that Cassirer’s suit falls within the “expropriation” exception to sovereign immunity, 28 U.S.C. § 1605(a)(3), which means that the courts of the United States have subject matter jurisdiction to entertain it. He has asserted a substantial and non-frivolous claim of a taking in violation of international law by Germany. We agree with the district court that Spain and the Foundation are not immune simply because neither was the taker. The Foundation, which claims to own the Pissarro that was taken from Cassirer’s grandmother, has engaged in various activities in the United States— some of which relate to the painting and encourage Americans to visit the museum — that show a commercial activity for purposes of § 1605(a)(3).
We also hold that § 1605(a)(3) does not mandate exhaustion of remedies as a prerequisite to jurisdiction. We decline to consider at this stage of proceedings whether prudential exhaustion may be invoked to affect when a decision on the merits may be made. Accordingly, we affirm the district court’s order denying motions by Spain and the Foundation to dismiss for lack of subject matter jurisdiction.
*1038 DISMISSED IN PART; AFFIRMED IN PART.

. Except as noted, we take the facts as alleged in the complaint as true because we are reviewing a denial of a motion to dismiss. Altmann v. Republic of Austria, 317 F.3d 954, 961-62 (9th Cir.2002), amended by 327 F.3d 1246 (9th Cir.2003), aff'd by 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004).

. Citizenship matters because we have held that the takings exception, at issue here, does not apply where the plaintiff is a citizen of the country that expropriates his property. Chuidian v. Philippine Nat’l Bank, 912 F.2d 1095, 1105 (9th Cir.1990). The district court's determination that Lilly was no longer regarded by Germany as a German citizen is not challenged on appeal.

. Cassirer also moved to expedite the Foundation's appeal. We granted this motion and sua sponte ordered the appeals to be consolidated.

. As part of our en banc process we asked the parlies to file simultaneous briefs as to whether this matter should be reheard en banc. Spain and the Foundation took the position that rehearing en banc is unnecessary because they intend to file a motion to dismiss the complaint on the ground that the claims are time-barred under Von Saher v. Norton Simon Museum of Art, 578 F.3d 1016 (9th Cir.2009). We express no opinion on the merits of this proposition.

. The House bill was passed in lieu of the Senate bill, so the House Report is the operative legislative history.

. Section 1330(a) provides:
The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

. Section 1604 provides:
Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

. There are exceptions for waiver, id. § 1605(a)(1); commercial activity, id. § 1605(a)(2); expropriation, id. § 1605(a)(3); succession, id. § 1605(a)(4); personal injury in the United States, id. § 1605(a)(5); arbitration, id. § 1605(a)(6); maritime liens, id. § 1605(b); terrorism, id. § 1605A; and counterclaims, id. § 1607.

.The House Report describes the phrase "taken in violation of international law” as including expropriations that are “arbitrary or discriminatory in nature,” or done "without payment of the prompt adequate and effective compensation required by international law.” 965 F.2d at 712 (quoting H.R.Rep. No. 94-1487, at 19-20, 1976 U.S.C.C.A.N. 6604, 6618). The Restatement provides that a foreign state is responsible for injury from a taking that “(a) is not for a public purpose, or (b) is discriminatory, or (c) is not accompanied by provision for just compensation....” Restatement (Third) of Foreign Relations Law of the United States § 712 (1987).

. The dissent invokes "another principle of statutory construction,” dis. op. at 1043, which we disagree is applicable. It is that statutes in derogation of the common law are to be strictly construed. In the dissent’s view, the common law gives sovereign nations like Spain a sovereign immunity. For this it relies on the Supreme Court's statement in Samantar v. Yousuf, — U.S. —, 130 S.Ct. 2278, —L.Ed.2d—(2010), that "[t]he doctrine of foreign sovereign immunity developed as a matter of common law long before the FSIA was enacted in 1976.” Id. at 2284. But the Court also made clear that "[a]fter the enactment of the FSIA, the Act — and not the preexisting common law — indisputably governs *1029 the determination of whether a foreign state is entitled to sovereign immunity.” Id. at 2285.

. The cited portion of the House Report explains the expropriation exception and states: (a)(3) Expropriation claims. — Section 1605(a)(3) would, in two categories of cases, deny immunity where "rights in property taken in violation of international law are in issue.” The first category involves cases where the property in question or any property exchanged for such property is present in the United States, and where such presence is in connection with a commercial activity carried on in the United States by the foreign state, or political subdivision, agency or instrumentality of the foreign state. The second category is where the property, or any property exchanged for such property, is (I) owned or operated by an agency or instrumentality of a foreign state and (ii) that agency or instrumentality is engaged in a commercial activity in the United States. Under the second category, the property need not be present in connection with a commercial activity of the agency or instrumentality. The term “taken in violation of international law” would include the nationalization or expropriation of properly without payment of the prompt adequate and effective compensation required by international law. It would also include takings which are arbitrary or discriminatory in nature. Since, however, this section deals solely with issues of immunity, it in no way affects existing law on the extent to which, if at all, the "act of state” doctrine may be applicable. See 22 U.S.C. 2370(e)(2).
H.R.Rep. No. 94-1487, at 19-20, 1976 U.S.C.C.A.N. 6604, 6618.

. It does so in explicating the so-called “Hickenlooper Exception” to the act of state doctrine. The "Hickenlooper Exception” is a shorthand reference to 22 U.S.C. § 2370(e)(2), which prohibited courts from declining on the ground of the act of state doctrine to determine the merits in cases where a claim to property is asserted based on a taking "by an act of that state in violation of the principles of international law.” Whether or not § 1605(a)(3) was intended to parallel or incorporate the concepts of the Hickenlooper Exception, as the dissent suggests, the observation is inapposite because the act of state doctrine is a substantive defense on the merits that is distinct from immunity. See Samantar, 130 S.Ct. at 2290-91. Besides this, the Hickenlooper Exception shows that Congress knows how to write "that state” when it wants to.

. Section 455 provides:
(3) Courts in the United States have jurisdiction with respect to claims to property taken by a foreign state in violation of international law if
(b) the property (or the proceeds thereof) is owned or operated by an instrumentality of the state and that instrumentality is engaged in commercial activity in the United States.
Restatement (Third) § 455. The comment, upon which the Foundation also relies, states that
the FSIA provides that if the property was taken by the foreign state in violation of international law, and if the property is ... owned or operated by an instrumentality of the foreign state that is engaged in commercial activity in the United States, there is a sufficient basis for jurisdiction to adjudicate claims to the property.

. Nor does the literal language strike us as so absurd that Congress couldn’t possibly have meant to provide a forum for adjudicating claims to property previously taken in violation of international law that is currently held by a different foreign state or its instrumentality, when the requisite nexus of commercial activity exists in the United States. Doing so is consistent with the familiar notion that a purchaser cannot get good title if property has been stolen at any place along the line, which is the general rule at common law. See, e.g., Marilyn E. Phelan, Scope of Due Diligence Investigation in Obtaining Title to Valuable Artwork, 23 Seattle U.L.Rev. 631, 633-34 (2000) (”[0]ne who purchases, no matter how innocently, from a thief, or all subsequent purchasers from the thief, acquires no title in the property. Title always remains with the true owner.”); see also U.C.C. § 2-403 (seller can only transfer the title that it possesses).

. Whether Spain was a good faith purchaser is not, of course, before us. The bona fides of its acquisition will no doubt be raised in defense on the merits, but is not a factor in the jurisdictional calculus. Likewise, the dissent's concern that a taking by one country can waive the sovereign immunity of "some innocent nation that comes upon the property later through legitimate means,” dis. op. at 1043, is premature. The Restatement sections upon which it relies speak to potential liability, not to immunity from suit. See Restatement (Second) of Foreign Relations Law of the United States §§ 164, 183 (1965); Restatement (Third) §§ 207, 712. They simply indicate that a state is responsible under international law for injury that is attributable to it or for which it failed to take reasonable preventive or punitive measures. But this case is not yet to the stage where these principles are in play.

. The dissent faults us for taking no heed of the fact that there may be "important diplomatic implications” of our decision. Dis. op. at 1041. However, this case involves a private dispute of the sort that Congress had in mind when enacting the FSIA. Moreover, as the Supreme Court recently explained, one of the two primary purposes described in § 1602 was "to transfer primary responsibility for deciding 'claims of foreign states to immunity' from the State Department to the courts.” Samantar, 130 S.Ct. at 2285; see also id. at 2291 n. 19 ("The Department sought and supported the elimination of its role with respect to claims against foreign states and their agencies or instrumentalities.”). Although we could have invited a statement of interest from the State Department, as the dissent suggests, Spain itself did not seek one and manifested no interest at oral argument in soliciting the Department's views.

. This comports with what happened in Altmann. While we did not directly decide the issue, we allowed the suit to go forward against Austria and the government-owned Austrian Gallery though it was alleged that the Klimt paintings at issue in that case had been confiscated in part by German Nazis. See 317 F.3d at 968.

. We have previously embraced a burdenshifling analysis under which the plaintiff has the initial burden of showing that an FSIA exception applies. If carried, the burden shifts to the defendant to show by a preponderance of the evidence that the exception does not apply. See Siderman, 965 F.2d at 707-08. The parties do not mention this *1033 framework, discuss its applicability' to this part of the § 1603(a)(3) analysis, or argue that it affects the outcome in any way.

. The second clause of § 1605(a)(3) also differs from the first. The first clause, which pertains to commercial activities of the foreign state itself, requires that those activities be "carried on” in the United States. Section 1603(e) defines “commercial activity carried on in the United States by a foreign state” as "commercial activity carried on by such state and having substantial contact with the United States.” The second clause, applicable here, relates to a "commercial activity” in which an instrumentality of a foreign state engages, and is subject to the broader definition of "commercial activity” in § 1603(d), which does not mention "substantial contact.”

. The Foundation makes no exhaustion argument, and does not join Spain's. Nor does the record disclose what remedies are available in either country.

. The requirement in former subsection (a)(7) was to arbitrate. Although not germane to our decision, we note that the arbitration requirement that was part of § 1605(a)(7) disappeared when that subsection was repealed, and reenacted in different form, in § 1605A. See National Defense Authorization Act for Fiscal Year 2008, Pub.L. No. 110-181, § 1083(b)(l)(A)(iii), 122 Stat. 3, 341 (2008) (repealing 28 U.S.C. § 1605(a)(7)).

. The Court of Appeals for the D.C. Circuit has expressed its belief that "this is likely correct.” Agudas Chasidei Chabad of U.S. v. Russian Fed’n, 528 F.3d 934, 948 (D.C.Cir.2008). In that case it was unnecessary to decide the issue definitively as the remedy Russia identified was inadequate in any event. However, the court did observe that "nothing in § 1605(a)(3) suggests that plaintiff must exhaust foreign remedies before bringing suit in the United States.” Id.

.The Supreme Court has often emphasized the importance of the comprehensiveness of this scheme in interpreting the FSIA. See, e.g., Verlinden, 461 U.S. at 488, 103 S.Ct. 1962(noting that Congress passed the FSIA with "a comprehensive set of legal standards” to free the government from case-by-case diplomatic pressures; to clarify the governing *1035 standards; and to assure litigants that decisions are made on purely legal grounds); Altmann, 541 U.S. at 699, 124 S.Ct. 2240("Quite obviously, Congress' purposes in enacting such a comprehensive jurisdictional scheme would be frustrated if, in postenactment cases concerning preenactment conduct, courts were to continue to follow the same ambiguous and politically charged standards that the FSIA replaced.” (internal quotation marks omitted)); Weltover, 504 U.S. at 610, 112 S.Ct. 2160 (noting that the FSIA “establishes a comprehensive framework”); Mesa v. California, 489 U.S. 121, 136, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989) (describing the FSIA as "a ‘comprehensive scheme’ comprising both pure jurisdictional provisions and federal law capable of supporting Art. Ill ‘arising under’ jurisdiction” (quoting Verlinden, 461 U.S. at 496, 103 S.Ct. 1962)); Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434-38, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (determining that the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court, even if provisions of another jurisdictional statute might apply, and referring to the House Report, which indicates that the primary purpose of the Act was to "set[] forth comprehensive rules governing sovereign immunity,” H.R. Rep. 94-1487, at 12, 1976 U.S.C.C.A.N. 6604, 6610).

. There can be no serious question this is a non-frivolous contention. See, e.g., Altmann, 317 F.3d at 968(assuming the facts as alleged were true, the Klimt paintings were "wrongfully and discriminatorily appropriated in violation of international law”); see also Bernstein v. N.V. Nederlandsche-Amerikaansche, Stoomvaart-Maatschappij, 210 F.2d 375, 375-76 (2d Cir.1954) (per curiam) (quoting State Department Press Release No. 296, April 27, 1949, entitled “Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers,” that publishes an April 13, 1949, letter from Jack B. Tate, Acting Legal Advisor of the Department of State, reiterating the government's “opposition to forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls”; stating the government’s "policy to undo the forced transfers”; and setting forth the policy of the executive branch with respect to claims asserted in the United States for restitution of such properly, "to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials”).

. As in Greenpeace and Millicom, this observation also has to do with a taking unaccompanied by just compensation. Justice Breyer draws on substantive Fifth Amendment law as set out in City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 721, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999), and Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984), which requires exhaustion of postdeprivation remedies because there cannot be constitutional injury until a state fails to provide just compensation. However, a taking may violate international law when it does not serve a public purpose or is discriminatory in nature — the kind of taking that Cassirer has pled for purposes of jurisdiction in this case — as well as when it is not accompanied by just compensation.

. Spain and Justice Breyer additionally allude to comment f of § 713 of the Restatement (Third), which states that "[ujnder international law, ordinarily a state is not required to consider a claim by another state for an injury to its national until that person has exhausted domestic remedies, unless such remedies are clearly sham or inadequate, or their application is unreasonably prolonged.” Restatement (Third) § 713 cmt. f. On its face this section applies only to claims by one state against another where interests of comity are most compelling. Section 1605(a)(3), by contrast, applies to claims by an individual against a foreign state of which he is not a citizen. But even if applicable to claims other than those by one state against another, and even if imbedded in international law, this section merely reflects "ordinary” practice. The FSIA does not incorporate it, and the legislative history doesn't mention it. In short, this source does not clearly indicate that Congress meant to require exhaustion even though it did not say so.

.The ATS confers jurisdiction on United States courts over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350.