**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID CASSIRER; AVA CASSIRER;
UNITED JEWISH FEDERATION OF SAN
DIEGO COUNTY, a California non-
profit corporation,
*Plaintiffs-Appellees*,

v.

THYSSEN-BORNEMISZA COLLECTION
FOUNDATION, an agency or
instrumentality of the Kingdom of
Spain,
*Defendant-Appellant.*

No.15-55550
15-55977

D.C. No.
2:05-cv-03459-
JFW-E

DAVID CASSIRER; AVA CASSIRER;
UNITED JEWISH FEDERATION OF SAN
DIEGO COUNTY, a California non-
profit corporation,
*Plaintiffs-Appellants*,

v.

THYSSEN-BORNEMISZA COLLECTION
FOUNDATION, an agency or
instrumentality of the Kingdom of
Spain,
*Defendant-Appellee.*

No. 15-55951

D.C. No.
2:05-cv-03459-
JFW-E

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted December 5, 2016
Pasadena, California

Filed July 10, 2017

Before:  Consuelo M. Callahan, Carlos T. Bea,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Bea

## SUMMARY[*]

### Foreign Sovereign Immunities Act / Holocaust Expropriated Art Recovery Act

The panel reversed the district court's grant of summary judgment, on remand, in favor of Thyssen-Bornemisza Collection Foundation, the defendant in an action under the Foreign Sovereign Immunities Act concerning a Camille Pissarro painting that was forcibly taken from the plaintiffs' great-grandmother by an art dealer who had been appointed by the Nazi government to conduct an appraisal.

The panel held that the Holocaust Expropriated Art Recovery Act of 2016 supplied the statute of limitations for the plaintiffs' claims. The claims were timely because they were filed within six years of the date of the plaintiffs' actual discovery of the artwork's location.

The panel held that when jurisdiction is based on the FSIA, federal common law, which follows the approach of the Restatement (Second) of Conflict of Laws, applies to the choice of law rule determination. Under the Second Restatement, Spain's substantive law governed defendant TBC's claim that it was the rightful owner of the painting.

The panel held that the district court erred in deciding that, as a matter of law, TBC had acquired title to the painting through Article 1955 of the Spanish Civil Code. The panel held that there was a triable issue of fact whether TBC was an *encubridor*, or accessory, to the theft of the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

painting within the meaning of Civil Code Article 1956. In Section III.C.1 of its opinion, the panel considered the following Spanish rules of statutory interpretation: (i) proper meaning of wording; (ii) context; (iii) historical and legislative background, including (a) definition of *encubridor* in the 1870 Penal Code, and (b) the 1950 Law; and (iv) social reality at the time of enactment. The panel concluded that an *encubridor* within the meaning of Article 1956 could include someone who, with knowledge that the good had been stolen from the rightful owner, received stolen goods for his personal benefit. The panel concluded that TBC had not established, as a matter of law, that it lacked actual knowledge that the painting was stolen property. The district court therefore erred in granting summary judgment on the grounds that, as a matter of law, TBC acquired the painting through acquisitive prescription.

The panel rejected TBC's other arguments for affirming the grant of summary judgment. First, the panel held that TBC was not entitled to summary judgment based on its claim that Baron Hans Heinrich Thyssen-Bornemisza, from whom it bought the painting, had lawful title under Swiss law. The panel concluded that there was a triable issue of fact as to the Baron's good faith in his possession of the painting. Second, the panel held that TBC was not entitled to summary judgment based on a laches defense under California law. Third, the panel held that the plaintiffs' claims were not foreclosed by their great-grandmother's acceptance of a 1958 settlement agreement with the Nazi art appraiser, the heir of another Jewish victim, and the German government.

The panel also concluded that the plaintiffs' other arguments against applying Article 1955 were without merit. The panel held that Spain's Historical Heritage Law did not

prevent TBC from acquiring prescriptive title to the painting. The panel also affirmed the district court's conclusion that the application of Article 1955 to vest TBC with title to the painting would not violate the European Convention on Human Rights.

The panel reversed the district court's judgment and remanded the case to the district court for further proceedings.

## COUNSEL

David Boies (argued), Boies Schiller & Flexner LLP, Armonk, New York; Devin Velvel Freedman and Stephen N. Zack, Boies Schiller & Flexner LLP, Miami, Florida; for Plaintiffs-Appellants/Cross-Appellees.

Thaddeus H. Stauber (argued), Jessica N. Walker, and Sarah Erickson André, Nixon Peabody LLP, Los Angeles, California, for Defendant-Appellee/Cross-Appellant.

Martin M. Ellison and Mary-Christine Sungaila, Haynes and Boone LLP, Costa Mesa, California, for Amicus Curiae Bet Tzedek Legal Services.

Kathleen Vermazen Radez, Associate Deputy Solicitor General; Joshua A. Klein, Deputy Solicitor General; Edward C. DuMont, Solicitor General; Office of the Attorney General, San Francisco, California; for Amicus Curiae State of California.

Sarah E. Gettings, Connie Lam, Christie P. Bahna, Benjamin G. Schatz, and Stanley W. Levy, Manatt Phelps & Phillips LLP, Los Angeles, California; Michael Bazyler,

Dale E. Fowler School of Law, Chapman University, Orange, California; for Amicus Curiae The 1939 Society.

Daragh M. Brehony and Bernardo M. Cremades Román, B. Cremades & Asociados, Madrid, Spain, for Amici Curiae Comunidad Judía de Madrid and Federación de Comunidades Judías de España.

Kelly L. Perigoe and Jeanne A. Fugate, Caldwell Leslie & Proctor PC, Los Angeles, California, for Amicus Curiae José Luis de Castro.

Jackson Herndon, Kelly A. Bonner, and Owen C. Pell, White & Case LLP, New York, New York; Agnes Peresztegi, Soffer Avocats, Paris, France; for Amicus Curiae Commission for Art Recovery.

---

## OPINION

BEA, Circuit Judge, with whom Judge Callahan concurs. Judge Ikuta concurs except as to Sections III.C.1.iii.b and III.C.1.iv:

In 1939 Germany, as part of the "Aryanization" of the property of German Jews, Lilly Neubauer ("Lilly")[1] was forced to "sell" a painting by Camille Pissarro (the "Painting"), a French Impressionist, to Jackob Scheidwimmer ("Scheidwimmer"), a Berlin art dealer. We

---

[1] In our two prior opinions, this Court has referred to Lilly Neubauer, the great-grandmother of Plaintiffs David Cassirer and Ava Cassirer, as "Lilly." *See Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010) (en banc); *Cassirer v. Thyssen-Bornemisza Collection Foundation*, 737 F.3d 613 (9th Cir. 2013).

use quotation marks around "sell" to distinguish the act from a true sale because Scheidwimmer had been appointed to appraise the Painting by the Nazi government, had refused to allow Lilly to take the Painting with her out of Germany, and had demanded that she sell it to him for all of $360 in Reichsmarks, which were to be deposited in a blocked account.  Lilly justifiably feared that unless she sold the Painting to Scheidwimmer she would not be allowed to leave Germany.  The district court found, and the parties agree, that the Painting was forcibly taken from Lilly.

The history of how the Cassirer family came to own the Painting, as well as the application of the Foreign Sovereign Immunity Act ("FSIA") which resulted in recognition of our jurisdiction to deal with the claims to the Painting, are detailed in our earlier en banc opinion.**[2]**  What primarily concerns us now is the sale of the Painting by the Baron Hans Heinrich Thyssen-Bornemisza (the "Baron") to the Thyssen-Bornemisza Collection ("TBC") in 1993, its display at TBC's museum in Madrid ever since, and what effect, if any, that possession has had on the claims of title by the parties to this action.

In short, in this third appeal to this Court, we are called upon to decide whether the district court correctly granted summary judgment to TBC based on TBC's claim that it acquired good title to the Painting through the operation of Spain's law of prescriptive acquisition (or "usucaption") as a result of TBC's public, peaceful, and uninterrupted possession in the capacity as owner of the Painting from 1993 until the Cassirers filed a petition requesting the return of the Painting in 2001.  Second, although not ruled upon by the district court, we consider whether the Baron's purchase

---

**[2]** *Kingdom of Spain*, 616 F.3d at 1023–24.

of the Painting, and his possession of it for years, vested him with good title under Swiss law—title he could validly pass to TBC in the 1993 sale. Third, we consider TBC's arguments that the Cassirers' claims are barred by laches or by Lilly's acceptance of a post-war settlement agreement with the German government. Finally, we consider the Cassirers' arguments that Spain's Historical Heritage Law and the European Convention on Human Rights prevent TBC from acquiring prescriptive title. Ultimately, we reverse the order which granted summary judgment and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY[3]

### A. The 1958 Settlement Agreement

After the Nazis forced Lilly to sell the Painting to Scheidwimmer in 1939, Scheidwimmer then forced another Jewish collector, Julius Sulzbacher ("Sulzbacher"), to exchange three German paintings for the Painting. Sulzbacher was also seeking to escape Nazi Germany. After the Sulzbacher family fled Germany, the Gestapo confiscated the Painting.

After the war, the Allies established a process for restoring property to the victims of Nazi looting. Military Law No. 59 ("MGL No. 59") authorized victims to seek restitution of looted property. In 1948, Lilly filed a timely claim against Scheidwimmer under MGL No. 59 for restitution of, or compensation for, the Painting. Sulzbacher also filed claims under MGL No. 59 seeking restitution of,

---

[3] As noted above, much of the factual history of this case is described in *Kingdom of Spain*, 616 F.3d at 1023–24. We include only such factual background as necessary to explain our decision in this case.

or compensation for, the Painting and the three German paintings.  In 1954, the United States Court of Restitution Appeals ("CORA") published a decision confirming that Lilly owned the Painting.

Although they knew Lilly was the owner of the Painting, Lilly, Sulzbacher, and Scheidwimmer believed the Painting was lost or destroyed during the war.  In 1957, after the German Federal Republic regained its sovereignty, Germany established a law governing claims relating to Nazi-looted property known as the Brüg.  Lilly then dropped her restitution claim against Scheidwimmer and initiated a claim against Germany for compensation for the wrongful taking of the Painting.  Grete Kahn, Sulzbacher's heir, was also a party in this action.

The parties to the action against Germany were unaware of the location of the Painting and only two of the German paintings originally owned by Sulzbacher were still available for return.  In 1958, the parties reached a settlement agreement (the "1958 Settlement Agreement").  This agreement provided that: (1) Germany would pay Lilly 120,000 Deutschmarks (the Painting's agreed value as of April 1, 1956); (2) Grete Kahn would receive 14,000 Deutschmarks from the payment to Lilly; and (3) Scheidwimmer would receive two of Sulzbacher's three German paintings.

## B.  The Painting's Post-War History

After the Nazis confiscated the Painting from Sulzbacher, it allegedly was sold at a Nazi government auction in Dusseldorf.  In 1943, the Painting was sold by an unknown consignor at the Lange Auction in Berlin to an unknown purchaser for 95,000 Reichsmarks.  In 1951, the Frank Perls Gallery of Beverly Hills arranged to move the

Painting out of Germany and into California to sell the Painting to collector Sidney Brody for $14,850.  In 1952, Sydney Schoenberg, a St. Louis art collector, purchased the Painting for $16,500.  In 1976, the Baron purchased the Painting through the Stephen Hahn Gallery in New York for $275,000.  The Baron kept the Painting in Switzerland as part of his collection until 1992, except when it was on public display in exhibitions outside Switzerland.

## C.  TBC's Purchase of the Painting

In 1988, Favorita Trustees Limited, an entity of the Baron, and Spain reached an agreement that the Baron would loan his art collection (the "Collection"), including the Painting, to Spain.  Pursuant to this agreement, Spain created TBC[4] to maintain, conserve, publicly exhibit, and promote the Collection's artwork.  TBC's initial board of directors had five members acting on behalf of the Spanish government and five members acting on behalf of the Baron and his family.  Spain agreed to display the Collection at the Villahermosa Palace in Madrid, Spain, and to restore and redesign the palace as a museum (the "Museum").  After the Villahermosa Palace had been restored and redesigned as the Museum, in 1992, pursuant to the loan agreement, the Museum received a number of paintings from Favorita Trustees Limited, including the Painting, and the Museum opened to the public.  In 1993, the Spanish government passed Real Decreto-Ley 11/1993, which authorized and funded the purchase of the Collection.  Spain bought the Collection by entering into an acquisition agreement with Favorita Trustees Limited.  The Real Decreto-Ley 11/1993

---

[4] TBC is an agency or instrumentality of the Kingdom of Spain, which this Court previously recognized in *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1027 (9th Cir. 2010).

classified the Collection as part of the Spanish Historical Heritage, which made the property subject to the provisions of the Spanish Historical Heritage Law.  TBC paid the Baron $350 million for the Collection.  The estimated value of the Collection at that time was somewhere between $1 billion and $2 billion.

In 1989, after the 1988 loan agreement, Spain and TBC investigated title to the works in the Collection.  In 1993, Spain and TBC did a second title investigation in connection with the purchase agreement.

### D.  Procedural History

In 2000, Claude Cassirer, a photographer, learned from a client that the Painting was in the Museum.  TBC does not dispute that Mr. Cassirer had "actual knowledge" of the Painting's location by 2000.  On May 3, 2001, the Cassirer family filed a petition in Spain seeking the return of the Painting.  After that petition was denied, in 2005, Claude Cassirer filed this action in the United States District Court for the Central District of California seeking the return of the Painting.[5]

As noted above, this case has been before this Court in two prior appeals. After the second remand to the district court, TBC filed a motion for summary adjudication.  TBC moved for summary adjudication of the following issues:

> (1) Plaintiffs' predecessor-in-interest, Lilly, waived her rights to the Pissarro Painting in the 1958 Settlement Agreement; (2) the

---

[5] Claude Cassirer died in 2010.  David and Ava Cassirer, his children, and the United Jewish Federation of San Diego County succeed to his claims.  Collectively, we refer to these plaintiffs as "the Cassirers."

Court lacks jurisdiction because any "taking in violation of international law" has already been remedied by Germany; and (3) the tenets of U.S. policy on Nazi-looted art require honoring the finality of the 1958 Settlement Agreement.

In a written order, the district court denied TBC's motion on the grounds that Lilly did not waive her right to physical restitution by accepting the Settlement Agreement, which also meant that the court retained jurisdiction under the FSIA and the Cassirers' claims do not conflict with federal policy. TBC filed an interlocutory appeal of that portion of the order which denied TBC's claim of sovereign immunity, as to which the district court denied TBC a certificate of appealability on the grounds that TBC's attempted interlocutory appeal was frivolous and/or waived because of this Court's decision in 2010, which determined that the district court could properly exercise jurisdiction pursuant to the FSIA. The district court thereby retained jurisdiction of the case pursuant to *Chuman v. Wright*, 960 F.2d 104, 105 (9th Cir. 1992). TBC now cross-appeals the district court's order denying its motion for summary adjudication based on the 1958 Settlement Agreement.

After its summary adjudication motion was denied, TBC moved for summary judgment on the grounds that it had obtained ownership of the Painting pursuant to Spain's law of acquisitive prescription as stated in Spain Civil Code Article 1955 ("Article 1955"). The Cassirers filed a motion for summary adjudication asking the court to hold that California law, not Spanish law, governs the merits of the case. The district court granted summary judgment in favor of TBC and denied the Cassirers' motion for summary adjudication. The district court concluded that Spanish law

governed TBC's claim that it owned the Painting pursuant to acquisitive prescription and that TBC owned the Painting because TBC had fulfilled the requirements of Article 1955. Before the district court, the Cassirers argued that their claims were timely pursuant to California Code of Civil Procedure § 338(c)(3)(A) ("§ 338(c)(3)(A)"), California's special statute of limitations for actions "for the specific recovery of a work of fine art brought against a museum . . . in the case of an unlawful taking or theft[.]" California enacted § 338(c)(3)(A) in 2010, five years after the Cassirers filed suit, but § 338(c)(3)(A) states that it applies to cases that are pending, *see* Cal. Civ. Proc. Code § 338(c)(3)(B). The district court held that, since TBC had acquired ownership of the Painting under Spanish law prior to the California legislature's enactment of § 338(c)(3)(A), retroactive application of that special statute of limitations would violate TBC's due process rights.

The district court entered judgment in favor of TBC. The Cassirers timely appealed.

TBC cross-appealed the summary judgment order to the extent that it did not address two arguments advanced in TBC's motion for summary judgment. First, that the Baron had acquired ownership of the Painting under Swiss law through prescriptive acquisition and had subsequently conveyed good title to TBC. Second, that the Cassirers' claims are barred by the equitable defense of laches. TBC also cross-appealed "any interlocutory decisions or orders adverse to [TBC]" and the motions filed by TBC that were

denied as moot by the district court following the district court's entry of judgment.**[6]**

This Court consolidated the parties' appeals. In summary, the following appeals on the merits are before this Court: (1) the Cassirers' appeal of the order which granted summary judgment in favor of TBC on the grounds that under applicable Spanish law, TBC acquired title to the Painting by prescriptive acquisition (usucaption), (2) TBC's appeal of the order which denied TBC's motion for summary adjudication, based on the assertion that Lilly waived her ownership rights to the Painting pursuant to the 1958 Settlement Agreement and that the district court lacked jurisdiction under the FSIA, (3) TBC's cross-appeal of the summary judgment order in its favor, for failure to consider and rule upon its claim under Swiss law and its defense of laches.

---

**[6]** These motions are TBC's Motion for Certification and TBC's Motion for Review and Reconsideration of the Magistrate Judge's Discovery Order. The motion for certification, which asked the district court to certify for interlocutory appeal TBC's claims relating to the 1958 Settlement Agreement are moot since we consider those claims in this opinion. In TBC's discovery motion, TBC sought reversal of the magistrate judge's denial of TBC's motion to compel production of thirteen letters between Lilly and her attorney. The motion is no longer moot in light of our decision in this opinion to reverse and remand this case. However, the district court did not consider this motion on the merits, and trial courts have "broad discretion" to permit or deny discovery, *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) (quoting *Goehring v. Brophy*, 94 F.3d 1294, 1305 (9th Cir. 1996)). Therefore, we will allow the district court to consider this discovery motion in the first instance on remand. *See Bermudez v. Duenas*, 936 F.2d 1064, 1068 (9th Cir. 1991) (remanding to the district court to consider in the first instance a discovery motion that was denied as moot after a grant of summary judgment).

## II.  JURISDICTION AND STANDARD OF REVIEW

The FSIA, 28 U.S.C. § 1330(a), gave the district court jurisdiction.  28 U.S.C. § 1291 gives this Court jurisdiction over this appeal.

This Court reviews an appeal from summary judgment de novo.  *Jones v. Union Pac. R.R. Co.*, 968 F.2d 937, 940 (9th Cir. 1992).  This Court reviews a district court's choice of law analysis de novo.  *Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000).  A district court's interpretation of foreign law is a question of law that this Court reviews de novo.  *Brady v. Brown*, 51 F.3d 810, 816 (9th Cir. 1995).  "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.

## III.  ANALYSIS

### A.  The Cassirers' claims are timely within the statute of limitations recently enacted by Congress to govern claims involving art expropriated during the Holocaust.

Before the district court, the parties and the district court agreed that California, as the forum, supplied the statute of limitations for the Cassirers' claims.  California Code of Civil Procedure § 338(c)(3)(A) requires that "an action for the specific recovery of a work of fine art" brought against a museum in the case of an "unlawful taking" be commenced within "six years of the actual discovery by the claimant" of the "identity and whereabouts of the work of fine art" and "[i]nformation or facts that [were] sufficient to indicate that the claimant ha[d] a claim for a possessory interest in the work of fine art that was unlawfully taken or stolen."  Cal.

Civ. Proc. Code § 338(c)(3)(A)(i)–(ii).  The primary issue below was whether retroactive application of § 338(c)(3)(A), which was passed in 2010, five years after the Cassirers filed suit, would violate TBC's due process rights.  The district court held that, since TBC "acquired ownership of the Painting under Spanish law prior to [the] California Legislature's retroactive extension of the statute of limitations" and the Cassirers' claims were time barred before the legislature passed § 338(c)(3)(A), retroactive application of § 338(c)(3)(A) would violate TBC's due process rights.  On appeal, TBC contends that retroactive application of § 338(c)(3)(A) would violate its due process rights.

However, while these appeals were pending before us, Congress passed, and the President signed, the Holocaust Expropriated Art Recovery Act of 2016 ("HEAR"), H.R. 6130.  For the reasons stated below, we conclude that HEAR supplies the statute of limitations to be applied in this case in federal court and that the Cassirers' claims are timely under this law.

HEAR states:

> Notwithstanding any other provision of Federal or State law or any defense at law relating to the passage of time, and except as otherwise provided in this section, a civil claim or cause of action against a defendant to recover any artwork or other property that was lost during the covered period because of Nazi persecution may be commenced not later than 6 years after the actual discovery by the claimant or the agent of the claimant of— (1) the identity and location of the artwork or other property; and (2) a possessory interest

> of the claimant in the artwork or other
> property.

*Id.* § 5(a).    Thus, HEAR creates a six-year statute of limitations period that commences on the date of actual discovery of the artwork's location by the claimant.  *Id.* § 5(a).   Lilly suffered the taking of the Painting in 1939, which is during the "covered period" of HEAR (January 1, 1933, and ending on December 31, 1945).  *See id.* § 4(3). The six-year statute of limitations applies to any claims that are pending on the date of HEAR's enactment, which was December 16, 2016, including claims on appeal such as the Cassirers'.  *See id.* § 5(d)(1) ("Subsection (a) shall apply to any civil claim or cause of action that is . . . pending in any court on the date of enactment of this Act, including any civil claim or cause of action that is pending on appeal . . . .").

Viewing the facts in the light most favorable to the Cassirers, as we must on an appeal from an order which granted summary judgment, *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 831 (9th Cir. 1991), the Cassirers acquired actual knowledge of the Painting's location in 2000 when Claude Cassirer learned from a client that the Painting was in the Museum.[7]   After the Cassirer family's 2001 petition in Spain was denied, the family filed this action on May 10, 2005.  Since the lawsuit appears to have been filed within six years of actual discovery, the Cassirers' claims are timely under the statute of limitations created by HEAR.

---

[7] Of course, the date of acquisition of actual knowledge is a fact subject to proof, and possible rebuttal, in proceedings before the district court.

**B. This Court applies the Second Restatement of the Conflict of Laws to determine which state's substantive law applies in deciding the merits of this case. The Second Restatement directs this Court to apply Spain's substantive law.**

Although Congress has directed federal courts to apply HEAR's six-year statute of limitations for claims involving art expropriated during the Holocaust, HEAR does not specify which state's substantive law will govern the merits of such claims. Under California law, thieves cannot pass good title to anyone, including a good faith purchaser. *Crocker Nat'l Bank v. Byrne & McDonnell*, 178 Cal. 329, 332 (1918). This is also the general rule at common law. *See Kingdom of Spain*, 616 F.3d at 1030, n.14 (quoting Marilyn E. Phelan, *Scope of Due Diligence Investigation in Obtaining Title to Valuable Artwork*, 23 Seattle U. L. Rev. 631, 633–34 (2000)) ("One who purchases, no matter how innocently, from a thief, or all subsequent purchasers from a thief, acquires no title in the property. Title always remains with the true owner."). This notion traces its lineage to Roman law (*nemo dat quod non habet*, meaning "no one gives what he does not have").[8]

But the application of our choice of law jurisprudence requires that we not apply such familiar rules, under the circumstances of this case. As we shall see, Spain's property

---

[8] Spanish law has some similar provisions. "Possession of movable property acquired in good faith is equivalent to title. Notwithstanding the foregoing, any person who has lost movable property or has been deprived of it illegally may claim it from its possessor." Civil Code Article 464, Ministerio de Justicia, *Spain Civil Code* 66 (2009) (English translation). However, the Spanish Civil Code must be read in its entirety, including those articles which provide that title to chattels may pass through qualified, extended possession, such as Article 1955.

laws will determine whether the Painting has passed to TBC via acquisitive prescription.

This Court has held that, when jurisdiction is based on the FSIA, "federal common law applies to the choice of law rule determination.  Federal common law follows the approach of the Restatement (Second) of Conflict of Laws." *Schoenberg v. Exportadora de Sal*, *S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991) (citations omitted).  The district court recognized this precedent, but believed that language from this Court's decision in *Sachs v. Republic of Austria*, 737 F.3d 584, 600 n.14 (9th Cir. 2013) (en banc), *rev'd on other grounds by OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015), called *Schoenberg*'s holding into question.

*Sachs* does not clearly overrule the *Schoenberg* precedent.  In *Sachs*, the plaintiff had been injured trying to board a train in Austria operated by a railroad ("OBB") that was owned by the Austrian government.  *Id.* at 587.  The district court granted OBB's motion to dismiss on the grounds of a lack of subject-matter jurisdiction, holding that OBB was immune from suit under the FSIA.  *Id.*  Sitting en banc, this Court reversed and held that it had subject matter jurisdiction pursuant to the commercial-activity exception to sovereign immunity in the FSIA.  *Id.* at 603.  In footnote 14 of the *Sachs* opinion, this Court held that California law governed the plaintiff's negligence claim.  *Id.* at 600 n.14. This Court assumed that California law applied because the railroad ticket was purchased in California and Sachs' action was brought in California.  *Id.* ("[W]e think it is a permissible view of Supreme Court precedent to look to California law to determine the elements of Sachs's claims[]" without engaging in a formal choice of law analysis.).  However, this Court then cited *Schoenberg* and took into consideration the Second Restatement choice of

law test. *See id.* ("Even if we should make a separate conflicts analysis under the Restatement, that conflicts analysis supports the same conclusion that California law applies to Sachs's claims."). Since *Sachs* did not expressly overrule *Schoenberg* and the Supreme Court has not overruled or effectively overruled *Schoenberg*, we must apply *Schoenberg* to determine which state's substantive law applies. *See Miller v. Gammie*, 335 F.3d 889, 896–900 (9th Cir. 2003). And, as noted above, *Schoenberg* instructs us to apply the Second Restatement. To the extent *Sachs* calls into doubt the need to apply the Second Restatement in certain FSIA cases, *Sachs* is distinguishable because in *Sachs* the plaintiff purchased her railroad ticket in California, *Sachs*, 737 F.3d at 587, while in this case TBC purchased the Painting in Spain and claims to have acquired prescriptive title by possessing the Painting in Spain. Therefore, we apply *Schoenberg* and the Second Restatement.**[9]**

The Second Restatement includes jurisdiction-selecting rules and a multi-factor inquiry in Section 6, which provides choice of law factors that a court should apply in the absence of a statutory directive to decide the applicable rule of law. In addition to considering any specific jurisdiction-selecting rule, a court is supposed to apply the Section 6 factors to

---

**[9]** The district court concluded that under *both* the Second Restatement and California's choice of law test (known as the governmental interest or comparative impairment test), Spain's substantive law applies to this case. Since we conclude that the Second Restatement test applies because *Schoenberg* controls, we do not apply California's choice of law test. We note that the courts in *Schoenberg* and *Sachs* both did not apply the forum's choice of law test. *Schoenberg*, 930 F.2d at 782–83; *Sachs*, 737 F.3d at 600 n.14.

decide which state has *the most significant relationship* to the case.**[10]**  These factors are:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Second Restatement § 6(2).  These factors are <u>not</u> listed in order of importance.  Second Restatement § 6, cmt. C. Instead, "varying weight will be given to a particular factor, or to a group of factors, in different areas of choice of law." *Id.*

Chapter 9 of the Second Restatement is focused on the choice of law considerations most relevant to property cases. Section 222 sets forth how the general choice of law principles stated in § 6 are applicable to real and personal property:

> The interest of the parties in a thing are determined, depending upon the circumstances, either by the "law" or by the "local law" of the state which, with respect to the particular issue, has the most significant

---

**[10]** For this reason, the Second Restatement's approach is often called the "most significant relationship" test.

> relationship to the thing and the parties under
> the principles stated in § 6.

Second Restatement § 222.    This general principle is "applicable to all things, to all interests in things and to all issues involving things.  Topic 2 (§§ 223–243) deals with interests in immovables and Topic 3 (§§ 244–266) with interests in movables."  Second Restatement § 222, cmt. a. Section 222 thus clarifies the subject of the § 6 "most significant relationship" inquiry: A court should consider which state "has the most significant relationship *to the thing and the parties* under the principles in § 6."[11]    Second Restatement § 222 (emphasis added).    Moreover, the commentary to § 222 notes the following about this "most significant relationship" inquiry:

> In judging a given state's interest in the
> application of one of its local law rules, the
> forum should concern itself with the question
> whether the courts of that state would have
> applied this rule in the decision of the case.
> The fact that these courts would have applied
> this rule may indicate that an important
> interest of that state would be served if the
> rule were applied by the forum.

Second Restatement § 222, cmt. e.    In addition, the commentary to § 222 clarifies that "[i]n contrast to torts, protection of the justified expectations of the parties is of

---

[11] In addition to citing § 6 in the text itself, the commentary to § 222 also clarifies that "the principles stated in § 6 underlie all rules of choice of law . . . ."  Second Restatement § 222, cmt. b.

considerable importance in the field of property."   Second Restatement § 222, cmt. b (citation omitted).

The Second Restatement also has a specialized rule for a claim of acquisition by adverse possession or prescription of an interest in chattel.   Second Restatement § 246 states, "Whether there has been a transfer of an interest in a chattel by adverse possession or by prescription and the nature of the interest transferred are determined by the local law of the state where the chattel was at the time the transfer is claimed to have taken place."   The Second Restatement provides the following rationale for this rule:

> The state where a chattel is situated has *the dominant interest* in determining the circumstances under which an interest in the chattel will be transferred by adverse possession or by prescription.  The local law of this state is applied to determine whether there has been such a transfer and the nature of the interest transferred.

Second Restatement, § 246, cmt. a (emphasis added).

After considering these sections of the Second Restatement and the relevant interests at stake, we conclude that this Court ought to apply Spanish law to decide whether TBC has title to the Painting.  Although some of the § 6 factors suggest California law should apply, on balance, these factors indicate Spanish law should apply because Spain is the "state which, with respect to the particular issue, has the most significant relationship to the thing and the parties under the principles stated in § 6."   Second Restatement § 222.  We note at the outset that the courts of Spain would apply their own property laws to adjudicate TBC's claim that it owns the Painting because Spain uses a

law of the situs rule for movable property.  *See* Civil Code
Article 10.1, Ministerio de Justicia, *Spain Civil Code* 4
(2009) (English translation).  As the commentary to § 222
notes, the fact that Spain would apply its own law suggests
that an important interest of Spain may be served by
applying Spanish law.

Also, as the district court recognized, the situs rule
furthers the needs of the international system by encouraging
certainty, predictability, and uniformity of result.
Considering the relevant policies of "interested states,"
Spain's interest in having its substantive law applied is
significant.  In a highly publicized sale, Spain provided TBC
public funds to purchase the Collection, including the
Painting.  TBC, an instrumentality of Spain, has possessed
the Painting for over twenty years and displayed it in the
Museum.  In terms of protecting justified expectations, the
1993 Acquisition Agreement between TBC and the Baron
states that English law governs the purchase of the
Collection.  But, the legal opinion provided by TBC's
counsel stated that, under English law, Spanish law would
govern the effect of the transfer.  The Cassirers do not
dispute this reading of English law.

Cutting in favor of the choice of California law is the fact
that the forum, California, has a strong interest in protecting
the rightful owners of fine arts who are dispossessed of their
property.  In fact, as noted in Part III.A, California has
created a specific statute of limitations for cases involving
an unlawful taking or theft of fine art.  We also acknowledge
that it is more difficult for a federal court to discern,
determine, and apply Spanish law than California law.

Factor 6(e), which requires a court to consider the basic
policies underlying property law, is arguably inconclusive.
The property laws of both Spain and California seek to create

certainty of title, discourage theft, and encourage owners of stolen property to seek return of their property in a timely fashion.  Although these states have chosen different rules for movable property, both sets of rules further the basic polices underlying property law.

On the other hand, § 246 indicates that Spain has the "dominant interest" in determining whether the Painting was transferred to TBC via acquisitive prescription because the Painting was bought in Spain and has remained in Spain. The Cassirers' arguments to the contrary are not persuasive. First, the Cassirers argue there is a bad faith exception to the law of the situs rule when an adverse possessor acquired property "which was known or should have been known to have been stolen."  However, since the Cassirers rely only on a 1980 English court decision in support of this proposition, the argument is unpersuasive.  Second, the Cassirers argue that the law of the situs rule is "outdated (not revised in 45 years), and is now inconsistent with modern choice of law principles."  However, the Cassirers cite cases in which courts have abolished the law of the situs rule for *tort actions*.  As a district court stated when applying § 246 in a stolen art case:

> The refusal by the New York Court of Appeals to apply the "place of injury" test in the tort field does not dictate a different result here.  This is because the choice of law rule advanced in the cited cases and adopted in Section 246 of the Restatement incorporates the concept of the "significant relationship."

*Kunstammlungen Zu Wimar v. Elicofon*, 536 F. Supp. 829, 846 (E.D.N.Y. 1981) (citation omitted).

In sum, after applying the Second Restatement § 6 factors and the law of the situs rule of § 246, we conclude that Spanish law governs TBC's claim that it is the rightful owner of the Painting.

The Cassirers argue in a letter submitted to this Court pursuant to Federal Rule of Appellate Procedure 28(j) that we should not apply Spain's law because of HEAR. According to the Cassirers, HEAR indicates that the application of Spain's substantive law in this case would be "truly obnoxious" to federal policy. However, HEAR does not specify which state's rules of decision should govern the merits of claims involving art expropriated during the Holocaust. HEAR simply supplies a statute of limitations during which such claims are timely. Thus, HEAR does not alter the choice of law analysis this Court uses to decide which state's law will govern TBC's claim of title to the Painting based on acquisitive prescription.

**C. The district court erred in deciding that, as matter of law, TBC had acquired title to the Painting through Article 1955 of the Spanish Civil Code because there is a triable issue of fact whether TBC is an *encubridor* (an "accessory") within the meaning of Civil Code Article 1956.[12]**

### 1. An *encubridor* can be a knowing receiver of stolen goods.

After correctly determining that Spanish substantive law applied, the district court granted summary judgment in

---

[12] In interpreting Spanish law, we have relied on the record below, submissions from the parties and amici, and our own independent research. *See* Federal Rule of Civil Procedure 44.1 ("In determining

favor of TBC based on the district court's analysis of Spain's law of acquisitive prescription.  Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As noted above, we view the evidence "in the light most favorable to the party opposing the motion," here, the Cassirers. *Am. Int'l Grp.*, 926 F.2d at 831.

The district court concluded that TBC had acquired title to the Painting because TBC had fulfilled the requirements of Article 1955, which states in relevant part, "Ownership of movable property prescribes by three years of uninterrupted possession in good faith.  Ownership of movable property also prescribes by six years of uninterrupted possession, without any other condition."  Ministerio de Justicia, *Spain Civil Code* 220 (2009) (English translation).  Possession is defined in Civil Code Article 1941, which states, "Possession must be in the capacity of the owner, and must be public, peaceful, and uninterrupted."  Ministerio de Justicia, *Spain Civil Code* 219 (2009) (English translation).

As an initial matter, we reject the Cassirers' argument that TBC's defense of acquisition of prescriptive title through usucaption based on Article 1955 is foreclosed by HEAR.  HEAR addresses when a suit may be commenced and creates a six-year statute of limitations that applies "notwithstanding any defense at law relating to the passage of time."  HEAR § 5(a).  Because of the time periods mentioned in Article 1955, TBC's defense based on Article 1955 could be at first glance considered "a defense at law

foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.")

relating to the passage of time." However, TBC's Article 1955 defense is a defense on the merits: that TBC has *acquired title to the Painting based on Spain's property laws*. *See* Article 1955 ("*Ownership* of personal property prescribes by . . .") (emphasis added), Ministerio de Justicia, *Spain Civil Code* 220 (2009) (English translation). Read in context, HEAR's § 5(a) language that the six-year statute of limitations applies "notwithstanding any defense at law relating to the passage of time" is meant to prevent courts from applying defenses that would have the effect of shortening the six-year period in which a suit may be commenced. HEAR does not bar claims based on the substantive law that vests title in a possessor, that is, the substantive law of prescription of title. Therefore, HEAR does not foreclose the possibility that TBC is entitled to summary judgment because TBC has acquired title to the Painting via Article 1955.

Read alone, Article 1955 would seem to vest title in one who gained possession, even absent good faith, after six years, so long as the possession was in the capacity as owner, public, peaceful, and uninterrupted. TBC took possession of the Painting in the capacity of an owner in 1993. TBC's claim was not challenged until the Cassirers' petition was filed in 2001. Although the Cassirers argue otherwise, TBC has established the "public" element because it is undisputed TBC publicly displayed the Painting in the Museum as part of the permanent collection it owned. Also, information about the Painting's location appeared in multiple publications between 1993 and 1999, the relevant six-year period. The parties agree TBC's possession was peaceful from 1993 until 1999. Finally, TBC's possession was uninterrupted during this time period. Thus, Article 1955, read in isolation, would seem to bar the Cassirers' action for recovery of the Painting.

But the very next article in the Spanish Civil Code, Article 1956, modifies how acquisitive prescription operates.  Article 1956 reads:

> Movable property purloined or stolen may not prescribe in the possession of those who purloined or stole it, or their accomplices or accessories [*encubridores*], until the crime or misdemeanor or its sentence, and the action to claim civil liability arising therefrom, should have become barred by the statute of limitations.

Ministerio de Justicia, *Spain Civil Code* 220 (2009) (English translation).  Therefore, as to any principals, accomplices, or accessories (*encubridores*) to a robbery or theft, Article 1956 extends the period of possession necessary to vest title to the time prescribed by Article 1955 *plus* the statute of limitations on the original crime and the action to claim civil liability.  *See* Spanish Supreme Court decision of 15 July 2004 (5241/2004).

The Cassirers argue that TBC is an accessory (*encubridor*) to the theft of the Painting because TBC knew the Painting had been stolen when TBC acquired the Painting from the Baron.  For the crime of *encubrimiento* (accessory after the fact) and the crime of receiving stolen property, the two crimes the Cassirers argue TBC committed when it purchased the Painting from the Baron in 1993, the criminal limitations period is five years, 1973 Penal Code Articles 30, 113, 546(bis)(a) and 1995 Penal Code Articles 131, 298, and the civil limitations period is fifteen years, Judgment of January 7, 1982 (RJ 1982/184) and Judgment of July 15, 2004 (no. 5241/2004).  Thus, if Article 1956 applies, including the six-year period from Article 1955,

TBC would need to possess the Painting for twenty six years after 1993, until 2019, to acquire title via acquisitive prescription. Since the Cassirers petitioned TBC for the Painting in 2001 and filed this action in 2005, *if Article 1956 applies*, TBC has not acquired prescriptive title to the Painting.**[13]**

Article 1956 extends the time of possession required for acquisitive prescription only as to those chattels (1) robbed or stolen from the rightful owner (2) as to the principals, accomplices or accessories after the fact ("*encubridores*")**[14]** with actual knowledge of the robbery or theft.

The parties agree the first requirement is satisfied because the forced sale of the Painting by Scheidwimmer and the Nazis is a misappropriation crime within the meaning of Article 1956. As for the second requirement, no one claims that TBC had any hand in that forced sale; TBC is not a principal or accomplice to the 1939 misappropriation of the Painting.

---

**[13]** The Cassirers also argue that TBC has not acquired title because, under Spanish law, there is no statute of limitations for a crime against humanity and a crime against property during armed conflict. Since resolving this claim would not change the result in this case, we decline to decide this issue.

**[14]** When Article 1956 was adopted in 1889, the contemporary dictionary meaning of *encubridor* was "one who covers something up." *See* 1884 Diccionario de la Lengua Castellana, Real Academia Española. The 1888 General Etymological Dictionary of the Spanish Language by the prestigious linguist Eduardo Echegaray mirrors the definition of the Real Academia. No legal meaning appears in the dictionaries. However, in an official translation of Article 1956 from Spain's Ministry of Justice, "*encubridores*" is translated as "accessories."

The primary dispute between the parties is whether TBC is an accessory (*encubridor*) as that term is used in Article 1956.  The district court accepted TBC's interpretation of Spanish law and found that TBC was not an *encubridor*.  The district court decided that the term "*encubridor*" in Civil Code Article 1956 should be defined by reference to the Penal Code that was in effect when TBC acquired the Painting.  In 1993, Article 17 of the Penal Code of 1973 (the Penal Code then in effect) defined *encubridor* to include only persons who, after the commission of the underlying crime, acted in some manner to aid those who committed the crime avoid penalties or prosecutions.[15]  Before the district court, the Cassirers argued that TBC was an *encubridor* because TBC concealed the looting of the Painting to prevent the 1939 crime from being discovered.  The district court held that TBC was not an *encubridor* within the meaning of Article 1956 because "there is absolutely no evidence that the Foundation purchased the Painting (or performed any subsequent acts) with the intent of preventing

---

[15] Article 17 of the 1973 Spanish Criminal Code defines *encubridores*:

> [T]hose who, aware of the perpetration of a punishable offense, without having had involvement in it as principals or accessories, are involved subsequent to its execution in any of the following ways:
>
> 1. Aiding and abetting the principals or accomplices to benefit from the felony or misdemeanors.
>
> 2. Hiding or destroying the evidence, effects or instruments of the felony or misdemeanor, to prevent it being discovered.
>
> 3. Harboring, concealing, or aiding the escape of suspected criminals . . . .

Scheidwimmer's or the Nazis' criminal offenses from being discovered." The district court concluded that, since Article 1956 did not apply, TBC had acquired title to the Painting under Article 1955.

On appeal, the Cassirers offer a new reason TBC is an Article 1956 accessory [*encubridor*]: According to the Cassirers, TBC knowingly received stolen property when TBC acquired the Painting from the Baron. The Cassirers advocate using the definition of *encubridor* from the 1870 Spanish Penal Code, which was in force when Article 1956 of the Civil Code was enacted in 1889. Article 16 of the 1870 Penal Code stated:

> Those who, with knowledge of the perpetration of the felony, and not having participated in it as perpetrators or accomplices, intervene after its execution in any of the following modes, are guilty of concealment: . . .
>
> 2. By obtaining benefit for themselves, or aiding the perpetrators to benefit from the effects of the crime.[16]

That definition of *encubridor* includes one who knowingly benefits himself from stolen property. The Cassirers argue that the 1889 legislature had the 1870 Penal Code definition

---

[16] "Son encubridores los que, con conocimiento de la perpetracion del delito, sin haber tenido participacion en él como autores ní cómplices, intervienen con posterioridad á su ejecucíon de alguno de los modos siguientes.   Aprovechándose por si mismos ó auxiliando á los delincuentes para que se aprovechen de los efectos del delito."

in mind when the legislature enacted Article 1956.  Article 1956 has not been modified since 1889.

TBC asserts that the Cassirers' new argument on appeal, that TBC is an *encubridor* based on the 1870 Penal Code definition because TBC, knowing of the theft, received the stolen painting, is "waived" because the Cassirers not did present it below.  However, the Cassirers' new argument asks this Court to interpret the term "*encubridor*" in Article 1956.  To do so, this Court must interpret the relevant sources of Spanish law.  Therefore, the meaning of *encubridor* is a pure issue of law.  Under this Court's precedent, we may consider a new argument on appeal which presents a pure issue of law even though it was not raised below.  *In re Mercury Interactive Corp. Sec. Lit.*, 618 F.3d 988, 992 (9th Cir. 2010).

For the reasons stated below, we agree with the Cassirers that the term "*encubridor*" in Article 1956 has the meaning that term was given it in the 1870 Penal Code.  We thus conclude that a person can be *encubridor* within the meaning of Article 1956 if he knowingly receives and benefits from stolen property.[17]

Since our jurisprudence requires us to apply Spanish substantive law, it stands to reason we should apply Spanish rules of statutory interpretation.  Article 3.1 of the Spanish Civil Code ("Article 3.1") states, "Rules shall be construed according to the proper meaning of their wording and in connection with the context, with their historical and

---

[17] Article 1956 requires that the *encubridor* must have actual knowledge the chattel was the product of robbery or theft.  *See* Spanish Supreme Court decision of 23 December 1986 (RJ 1986/7982).

legislative background and with the social reality of the time in which they are to be applied, mainly attending to their spirit and purpose." [18]   Ministerio de Justicia, *Spain Civil Code* 1 (2009) (English translation).

### i.   Proper Meaning of Wording

To determine the definition of "*encubridor*" in Article 1956, Article 3.1 first directs us to consider the "proper meaning of [its] wording."   As noted above, dictionaries contemporary to the 1889 Civil Code shed little light on any legal meaning for the term *encubridor*.   The 1884 Diccionario de la Lengua Castellana, Real Academia Española defines "*encubridor*" as one who practices "*encubrimiento*," which in turn is defined as "the action and effect of hiding a thing or not manifesting it."[19]   The 1888 General Etymological Dictionary of the Spanish Language by the prestigious linguist Eduardo Echegaray mirrors the definition of the Real Academia.[20]   Neither discusses the meaning of *encubridor* in legal terms or as used in the law. There is no mention of such elements as whether to be an *encubridor* the person need have knowledge of a prior crime or be motivated by a desire to help others or only himself.

---

[18] "Las normas se intepretarán según el sentido propio de sus palabras, en relación con el contexto, los antecedentes históricos y legislativos, y la realidad social del tiempo en que han de ser aplicadas, atendiendo fundamentalmente al espíritu y finalidad de aquellas."

[19] **Encubridor**: Que encubre.   **Encubrir**: Ocultar una cosa ó no manifestarla.

[20] **Encubridor, ra:** Que encubre alguna cosa.   Usase también como sustantivo.   **Encubrir:** Ocultar una cosa ó no manifestarla.

Of course, if an *encubridor* hides the chattel, he cannot fulfill the open, public display of the chattel, in the capacity of an owner, which Article 1955 requires for usucaption. Does it follow that if he displays the chattel sufficiently to satisfy usucaption possession he is not an *encubridor*? Certainly, TBC displayed the Painting to the public and acted as the owner of the Painting.

This logic could be accepted if the word *encubridor* was used in Spanish law to mean only a person who conceals or hides or fails to manifest. But that is not what has been found to be the case, as we will see when we apply the second rule of interpretation prescribed by Article 3.1.

### ii.  Context

Second, Article 3.1 instructs us to determine the meaning of a rule "in connection with the context." "*Encubridor*" in Article 1956 is used in a legal context. Hence, what does *encubridor* mean in Spanish law?

Both parties agree that the Penal Code is the proper place to look for the legal meaning of the term *encubridor*. However, while the Cassirers urge this Court to use the 1870 Penal Code definition, which includes a receiver of stolen goods who acts for his own benefit, TBC urges this Court to use the 1973 Penal Code definition, which TBC claims excludes such a receiver. Under the 1973 Penal Code, only accessories after the fact acting in aid of the perpetrators or accomplices of the original crime are expressly declared *encubridores* under Article 17.1.

### iii.  Historical and Legislative Background

These conflicting positions require us to go to the third canon of interpretation stated in Article 3.1: "the historical and legislative background."

### a.  Definition of "*encubridor*" in the 1870 Penal Code

Looking to "the historical and legislative background" of Article 1956, we conclude that the term "*encubridor*" should be construed consistently with the definition of "*encubridor*" in the 1870 Penal Code.  The parties agree that the content of the term "*encubridor*" in the Civil Code should be determined by reference to the Penal Code.  The 1870 Penal Code was in effect when Article 1956 of the Civil Code was enacted in 1889, and Article 1956 has not been amended since its enactment.  Under the 1870 Penal Code, "[t]hose who, with knowledge of the perpetration of a crime," intervene after its execution "[b]y obtaining benefit for themselves, or aiding the perpetrators to benefit from the effects of the crime" are *encubridores*.  Thus, if the 1870 Penal Code definition of "*encubridor*" applies for Civil Code Article 1956, an *encubridor* includes someone who knowingly benefits from stolen property, including a person who knowingly receives stolen property.

However, TBC claims that the Law of May 9, 1950 ("1950 Law") removed from the Penal Code's definition of *encubridor* a person who, with knowledge of the theft or robbery which produced the stolen chattel, took the chattel into his possession solely for his own benefit and not for the benefit of the perpetrators of the theft or robbery and that this law changed the definition of "*encubridor*" in Civil Code Article 1956 as well.  There are two reasons this is not so.

First, Article 3.1's instruction to evaluate a statute's "historical and legislative background," Ministerio de Justicia, *Spain Civil Code* 1 (2009) (English translation), refers to the history that occurred before Article 1956 was enacted in 1889, not subsequent developments. Although the Spanish legislature modified *the Penal Code* through the 1950 Law, it did not alter *the Civil Code*, including Article 1956. Therefore, the 1870 Penal Code provides the pertinent definition of the term "*encubridor*" in Article 1956.

### b.  The 1950 Law

Second, even if the 1950 Law should affect how we interpret the term "*encubridor*" in Article 1956, we reject TBC's suggestion that the enactment of the 1950 Law changed the definition of "*encubridor.*"     True, in its enactment of Article 17.1, the 1950 Law *eliminated Article 16.1* of the 1870 Penal Code and that portion of the definition of *encubridor* that included an accessory after the fact acting for his own benefit. The 1950 law enacted Article 17.1, which restricted *encubridor* to include only accessories after the fact acting on behalf or in aid of the original thieves and accomplices. But the 1950 Law did not eliminate altogether from the Penal Code the 1870 definition of *encubridor* that included a person acting for his own benefit, motivated by lucre. First, the 1950 Law recited in its preamble an intention *not* to change the venerable law regarding accessories: "[I]t does not seem prudent to radically change this institution, that is now in Division I of the common Criminal Code, a penalizing law that is a homogeneous piece mounted on a venerable and correct classic. And it does not seem advisable until one day the general lines of our old Code are changed, if need be." Second, *it simply moved the 1870 definition of encubridor elsewhere* in enacting the new statute that made it a crime to receive goods known to be

stolen.   Article 2 of the 1950 Law created the crime of receiving stolen property as Article 546(bis)(a) of the Penal Code with the title "Del encubrimiento con ánimo de lucro y de la receptación" (meaning "Regarding acting as the accessory [*encubrimiento*] with the purpose of obtaining profit or receiving stolen property [*receptación*]").   Thus, *encubrimiento* in the Penal Code was *still* described as including acting as an accessory by receiving stolen goods for one's own benefit.

The preamble to the 1950 Law in fact also states that the purpose of the law is procedural: to allow independent criminal prosecutions for receivers of stolen goods even when the principals of, or accomplices to, the theft or robbery cannot be located.   Under Spanish law at the time, accessories after the fact could not be charged by themselves.   They were subject only to a joint proceeding in which they were joined as defendants with principals and accessories, if any.

The language of Article 546(bis)(a) of the Penal Code, as adopted at the time, reflects the fact that receiving stolen goods had long been considered a form of *encubrimineto* (acting as an accessory):

> Who with knowledge of the commission of a felony against property takes advantage for himself of the product of the [felony], will be punished with minor jail and fined from 5,000 to 50,000 pesetas.   In no case can a sentence which deprives one of liberty exceed that established *for the felony concealed* ["*al delito encubierto*"].

Specifically, the use of the adjective "*encubierto*" to describe the activities of a receiver of stolen goods acting for

his own benefit implies that the receiver is himself an *encubridor*.  Thus, the historical and legislative background of the term *encubridor* in the Spanish Penal Code suggests that someone who knowingly receives and benefits from stolen property can qualify as an *encubridor* for purposes of Civil Code Article 1956.

### iv.  Social Reality at Time of Enactment

Turning to the fourth canon in Article 3.1, this Court should consider "the social reality of the time" in which Article 1956 is to be applied.  In 1993, when TBC acquired the Painting, the crime of receiving property known to be stolen and the crime of acting as accessory after the fact of theft by possessing such property were interchangeable in practice.  This fact is demonstrated by the Judgment 1678/1993 of July 5 (RJ 1993/5881) that is cited in the amicus brief of Comunidad Judía de Madrid and Federación de Comunidades Judías de España.  In that case, the appeal to the Supreme Court of Spain was on the basis of what we call a "variance" between the indictment and the crime of conviction.  The appellant had been *accused of receiving stolen goods*, but was *convicted of being an accessory after the fact*.  The Spanish Supreme Court found that the perpetrator's actions in receiving stolen jewelry to sell and keep the proceeds were sufficiently laid out in the accusatory pleading to allow the defendant to mount an adequate defense to the charge of being an accessory after the fact, even if he was convicted of a crime strictly not charged.  There was no mention of the defendant acting in aid of the persons who had committed the original jewelry theft.  As the court stated, "Thus then, we must say that here we find ourselves before two homogeneous felonies, with identity of rights protected and in fact adjudged, and as the sentence imposed was less [than that of the crime laid out in the

accusation] it is clear that the principle of [fair notice] accusation was lawfully respected."

The Spanish Supreme Court also recognized the interchangeability of the crimes of receiving stolen goods and of being an accessory after the fact (*encubridor*) in Judgment 77/2004, of 21 January (RJ2004/485). [21]   In this case, a boat was stolen in Germany and the defendant knew it was stolen.  After trying to sell the boat to a good faith purchaser, the defendant was accused of being a receiver of stolen goods (*receptador*) by accusatory pleading, but then was convicted under Article 17.1 as an accessory after the fact (*encubridor*).   The court found no fatal "variance" between the accusatory pleading under Article 546(bis)(a) and the conviction under Article 17.1 because the defendant was given fair notice of all the "points" on which conviction would depend at trial, and hence could mount a complete defense.  According to the Supreme Court, both crimes require (1) knowledge of the prior felony and the stolen nature of the goods in question and (2) possession of those goods by the accused.  Again, there was no mention that the defendant acted as an accessory after the fact by concealing, in aid of the boat's thief.

---

**[21]** In 1995, the Penal Code was updated and the crime of receiving stolen goods was moved to Article 298 of the Penal Code.  Of note, in specifying sentencing, Article 298 retains the language used in the old Article 546(bis)(a), "Under no circumstances whatsoever may a sentence of imprisonment be imposed that exceeds that set for the felony concealed."   In Spanish, "En ningún caso podrá imponerse pena privativa de libertad que exceda de la señalada al delito encubierto."  This was the same language that was used in Article 546(bis)(a) in force from 1950 to 1995.

Our conclusion that the terms "accessory motivated by lucre" and "receiver of stolen goods" are interchangeable and have been preserved in the Spanish Penal Code following the 1950 Law is not novel.  This seems to have been the interpretation given that portion of the 1950 Law by Cuello Calón in his annual report on criminal law: "*Anuario*: Annual of Penal Law and Penal Sciences (1951), modifications introduced in the Penal Code as to accessory [liability] by the Law of 9 May, 1950."[22]  As Calón states, "Better fortune [as to the survival of the terms after the 1950 law] has occurred to the so-called '*receptación*' or '*encubrimiento*' for both expressions are used as synonyms by the new law."[23]

In sum, after applying the four methods of interpretation set forth in Article 3.1, we conclude that the meaning of *encubridor* (accessory after the fact) in the 1889 Civil Code is that of the 1870 Penal Code and that later legislation has not changed that meaning.  Thus, an Article 1956 *encubridor* can be someone who acts as accessory after the fact of the crime committed, and who acts for his own benefit—to gain lucre.  A detailed reading of the 1950 Law tells us this meaning of *encubridor* was not intended to be changed nor was in fact changed by that Law.  That law rearranged the

---

[22] Anuario de Derecho Penal y Ciencias Penales (1950), Modificaciones introducidas en el Codigo penal en materia de encubrimiento por la Ley de 9 de Mayo, 1950, p. 346, Eugenio Cuello Calón ("Anuario, 1950").  *See also* Cuello Calón, *Derecho Penal* 672 (C. Camargo Hernandez rev. 18th ed. 1981) (explaining that concealment is a crime separate and distinct from the original theft and robbery which provided the stolen chattel).

[23] "Mejor suerte ha cabido a la llamada 'receptación o encubrimiento, con ánimo de lucro' pues ambas expresiones son usadas como sinónimas por la nueva ley."

concept of an accessory after the fact acting for his own benefit into the receipt of stolen goods for procedural convenience: to allow prosecution of the suspect without the necessity of a joint prosecution of the principals and accomplices, if any, of the underlying crime.  But a knowing receiver of stolen goods could still be prosecuted as an accessory after the fact to the theft even if he benefited only himself.  The meaning of "*encubridor*" is considered interchangeable with "*receptador*" (receiver of goods known to be stolen) as shown by the title and text of Article 2 of the 1950 Law.  Also, this reading of the Law of May 9, 1950, is confirmed by Spanish Supreme Court decisions which describe the two terms as interchangeable and homogeneous.  Last, this homogeneity is recognized by the official annual report written by Cuello Calón contemporaneously with the adoption of the 1950 Law.

## 2. TBC has not established, as a matter of law, that it did not have actual knowledge the Painting was stolen property.

Assuming Article 1956 applies to someone who knowingly benefits from stolen property, TBC has not established as a matter of law that it acquired title to the Painting through acquisitive prescription.  Clearly, TBC benefited from having the Painting in its museum.  As for the required actual knowledge element of Article 1956, we review the evidence proffered by the Cassirers with all inferences in their favor as required by our summary judgment rules, to see if the Cassirers have produced sufficient evidence to create a triable issue of fact that TBC knew the Painting had been stolen from its rightful owner(s) when TBC acquired the Painting from the Baron.

Dr. Jonathan Petropoulos, the Cassirers' expert and a professor of European History who has published on the

subject of Nazi art looting, declared that numerous so-called "red flags" would have indicated to TBC (and to the Baron) that the Painting was stolen.[24]  The provenance information given by the Stephen Hahn Gallery to the Baron in 1976 did not mention a previous owner, only the gallery Durand-Ruel in Paris, where the painting was said to have been exhibited in 1898 and 1899.[25]  The Painting contained a partial label on the back that said "Berlin" and part of two words "Kunst– und Ve . . ." that may be German for "art and publishing establishment" ("Kunst und Verlagsanstalt").  This label may be from the Cassirers' art gallery.  Although this label was on the back of the Painting, the Painting had no documentation showing a voluntary transfer of the Painting out of Berlin.  Also, according to Dr. Petropoulos, Pissarro paintings were "immediately suspect" because they were favored by European Jewish collectors and often looted by the Nazis.  Dr. Petropoulos noted that the French Ministry of Culture in 1947 published a compendium of French cultural losses during World War II that includes forty-six works by Pissarro that were looted by the Nazis and have yet to be recovered.  The CORA decision confirming Lilly's rightful ownership of the Painting had been published and made available to the public.[26]

---

[24] TBC started investigating the Baron's collection in 1989.  Thus, TBC had time to discover these red flags before the 1993 purchase.

[25] Julius Cassirer, who was Lilly's father-in-law, bought the Painting from Paul Durand-Ruel in Paris in 1898.

[26] Dr. Petropoulos provided some evidence that suggests TBC may have been aware of this decision: the CORA decision was cited in a 1974 book about Allied restitution laws published by a prestigious German publisher that received reviews in English language periodicals.

How TBC purchased the Painting also provides some evidence that TBC knew the Painting was stolen. While TBC held the collection on loan, in an official publication in 1992, *Modern Masters* by Jose Alvarez Lopera, TBC published incorrect provenance history that stated the Baron had acquired the Painting through the Joseph Hahn Gallery in Paris when in fact the Baron purchased the Painting through the Stephen Hahn Gallery in New York. The Cassirers argue that TBC sought to conceal the Painting's provenance because the Stephen Hahn Gallery sold at least one other work looted by the Nazis. Also, when investigating the Baron's collection, TBC's lawyers decided to assume the Baron acquired his collection in good faith. By assuming good faith, *TBC chose to investigate only artwork that was acquired by the Baron after 1980*. One possible inference is that TBC knew the Painting was stolen and did not want to create documentation that reflected this history.

TBC paid $338 million for the Baron's Collection that included the Painting when the Collection's estimated value was between one and two billion dollars. Although TBC offers a number of innocent explanations for this below-market price, this fact may indicate that TBC knew the Painting and other works in the collection were stolen. William Smith, an expert in 16th to 20th century European paintings who filed a declaration on behalf of the Cassirers, opined that the Painting was sold *to the Baron* at a discount of 41.2%–50% of the estimated gallery retail price. TBC argues that the Baron did not purchase the Painting at a suspiciously low cost, but we must consider this clash of evidence in the light most favorable to the Cassirers. TBC's knowledge of the below-market price the Baron acquired the Painting for may also suggest TBC knew the Painting was stolen.

In conclusion, when all of the evidence is considered in the light most favorable to the Cassirers, the Cassirers have created a triable issue of fact whether TBC knew the Painting was stolen from Lilly when TBC purchased the Painting from the Baron.  TBC acquired the Painting for its own benefit, and TBC may have known the Painting was stolen. If so, TBC can be found by the trier of fact to be an *encubridor* who could not have acquired title to the Painting through acquisitive prescription until 2019 since an Article 1956 *encubridor* can be someone who knowingly benefits from the receipt of stolen property.  Therefore, the district court erred in granting summary judgment on the grounds that, as a matter of law, TBC acquired the Painting through acquisitive prescription.**[27]**

### D.  TBC is not entitled to summary judgment based on its claim that the Baron had lawful title to the Painting under Swiss law.

In TBC's cross-appeal of the summary judgment order, TBC argues that "it is the lawful owner of the Painting because [TBC] purchased the Painting in a lawful conveyance from a party (the Baron) who had valid title to convey."  Since the district court granted summary judgment in favor of TBC on the basis of Spanish law, the district court did not consider TBC's argument that the Baron gained

---

**[27]** The Cassirers make a similar argument that TBC "purloined" the Painting within the meaning of Article 1956 and therefore could not have acquired the Painting through acquisitive prescription.  In support of this argument, the Cassirers cite Spanish authorities suggesting the term "purloin" in Article 1956 can include knowing receipt of stolen goods. Therefore, whether interpreting "*encubridor*" or "purloin," the Cassirers' argument turns on whether someone who receives and benefits from goods known by him to be stolen is delayed in taking prescriptive title because of Article 1956.

lawful title before transferring the Painting to TBC. Nonetheless, "if the district court's order can be sustained on any ground supported by the record that was before the district court at the time of the ruling, we are obliged to affirm the district court." *Jewel Cos., Inc. v. Pay Less Drugs Stores Nw. Inc.*, 741 F.2d 1555, 1564–65 (9th Cir. 1984) (citing *Calnetics Corp v. Volkswagen of Am., Inc.*, 532 F.2d 674, 682 (9th Cir. 1976)).

We begin our analysis by considering which state's law governs the effect of the conveyance from the Baron to TBC. As noted in Part III.B, based on the principles set forth in the Second Restatement of the Conflict of Laws, this Court should apply Spanish property law to adjudicate TBC's claim that it is the rightful owner of the Painting. Also, § 245 of the Second Restatement states, "The effect of a conveyance [from the Baron to TBC] upon a pre-existing interest in a chattel of a person [Cassirer] who was not a party to the conveyance will usually be determined by the law that would be applied by the courts of the state where the chattel was at the time of the conveyance." The Painting was in Spain when TBC and the Baron entered into the acquisition agreement on June 21, 1993, because TBC had held the Painting as part of the prior loan agreement. As noted in Part III.B, Spain uses the law of the situs rule for movable property. *See* Civil Code Article 10.1, Ministerio de Justicia, *Spain Civil Code* 4 (2009) (English translation). This means Spain would apply its own property laws to decide the effect of the conveyance from the Baron to TBC. Thus, the Second Restatement directs us to apply Spanish law to determine whether TBC acquired ownership of the Painting via the 1993 acquisition agreement.

Under Spanish law, a consensual transfer of ownership requires title and the transfer of possession. *See* Civil Code

Article 609, Ministerio de Justicia, *Spain Civil Code* 83 (2009) (English translation).  As noted, when the acquisition agreement was entered into, possession of the Painting had already been transferred to TBC pursuant to the loan agreement.  Therefore, *if the Baron had good title to the Painting* when he sold it to TBC, then TBC became the lawful owner of the Painting through the acquisition agreement.

TBC argues that the Baron had good title to convey because the Baron acquired good title to the Painting either through the Baron's purchase of the Painting in 1976 from the Stephen Hahn Gallery in New York or through Switzerland's law of acquisitive prescription.  Since Spain applies the law of the situs for movable property, Spanish law would look to New York law to determine the effect of the 1976 conveyance in New York, and Swiss law to determine whether the Baron acquired title to the Painting when he possessed it in Switzerland between 1976 and 1992.

Under New York law, "a thief cannot pass good title." *See Bakalar v. Vavra*, 619 F.3d 136, 140 (2d. Cir. 2010) (citing *Menzel v. List*, 267 N.Y.S. 2d 804 (N.Y. Sup. Ct. 1966)).  "This means that, under New York law, . . . absent other considerations an artwork stolen during World War II still belongs to the original owner, even if there have been several subsequent buyers and even if each of those buyers was completely unaware that she was buying stolen goods." *Id.* (internal quotation marks omitted).  Here, even if the Stephen Hahn Gallery (the gallery from which TBC alleges the Baron purchased the Painting) had no knowledge that the Nazis stole the Painting, the conveyance did not confer good title on the Baron under New York law.

As noted, TBC also argues that the Baron acquired title to the Painting through the Swiss law of acquisitive

prescription. Under Swiss law, to acquire title to movable property through acquisitive prescription, a person must possess the chattel in good faith for a five-year period. Swiss Civil Code Article 728. The Baron completed the five-year period of possession between 1976 and 1981. Even though the Baron exhibited the Painting during a tour of Australia and New Zealand in 1979 and 1981, TBC's Swiss law expert stated that this exhibition abroad "did not create a legally relevant interruption, since the Painting was bound to return to [Switzerland]." In briefing to this Court, the Cassirers do not dispute that the Baron possessed the Painting for a sufficient amount of time.

However, the Baron acquired title through acquisitive prescription only if he possessed the Painting *in good faith*. The Cassirers assert there is a triable issue of fact as to whether the Baron possessed the Painting in good faith. Swiss law presumes good faith. *See* Swiss Civil Code Article 3.1. But good faith can be rebutted by showing that a person "failed to exercise the diligence required by the circumstances." *See* Swiss Civil Code Article 3.2. According to Dr. Wolfgang Ernst, TBC's Swiss law expert, the finding of good faith or bad faith in an individual case is considered to be an issue of fact.

In determining whether a purchaser acted in good faith or not, the Swiss Supreme Court has considered factors such as: (1) whether the purchaser should have considered the stolen or looted origin of the object at least as a possibility; (2) the fact that specific circumstances, such as war, required a high degree of attention; and (3) the general public knowledge of the circumstances in which the works of art were taken from their legitimate owners. *See Paul Rosenberg v. Theodore Fisher et al.*, Swiss Supreme Court June 3, 1948. Thus, a good faith purchaser is one who is

*honestly and reasonably* convinced that the seller is entitled to transfer ownership.

After reviewing the record developed before the district court, we conclude that there is a triable issue of fact as to the Baron's good faith.  As noted in Part III.C, the Stephen Hahn Gallery from which the Baron purchased the Painting sold at least one other work looted by the Nazis.  William Smith, the Cassirers' expert in European paintings, stated that the $275,000 price the Baron paid for the Pissarro in 1976 "was approximately half of what would have been expected in a dealer sale, and that there is no reasonable explanation for this price other than dubious provenance."[28]

Furthermore, Dr. Jonathan Petropoulos' "red flags" analysis of the Painting's background provides some evidence that suggests the Baron did not possess the Painting in good faith.[29]  To recap these alleged "red flags," the Nazis looted many Pissarro paintings, which were a favorite among European Jewish collectors.  Moreover, the Painting had a torn label on the back from a gallery in Berlin (the Cassirers' gallery), but no documentation showing a voluntary transfer of the Painting out of Berlin.  The published CORA decision identified Lilly's ownership of

---

[28] Although TBC's expert, Dr. Ernst, stated that he was "not aware of any evidence that this price was conspicuously low so as to indicate eventual problems regarding the provenance/title situation[,]" we must view this conflict of evidence in the light most favorable to the non-moving party, the Cassirers.

[29] As Dr. Petropoulos declared, "In my opinion, if the Baron and TBC did not in fact know of the faulty provenance of the Painting and the high likelihood that they were trafficking in Nazi looted art, they were willfully blind to this risk and ignored very obvious 'red flags' that no reasonable buyer would have ignored."

the Painting. Also, Dr. Petropoulos stated that Ardelia Hall and Ely Maurer at the United States State Department collected CORA decision reports and warned museums, university art facilities, and art dealers about looted artworks entering the United States and that, had the Baron contacted these individuals about the Painting, the CORA decision would have been discovered. When the Baron purchased the Painting, the Stephen Hahn Gallery provided minimal provenance information: no previous owner was mentioned, only the gallery Durand-Ruel in Paris, where the painting was said to have been exhibited in 1898 and 1899. Dr. Petropoulos states that the Baron's "highly distinguished cohort of experts" failed to "undertake a serious investigation" to determine the provenance of the Painting. Another expert for the Cassirers, Marc-André Renold, a professor at the University of Geneva Law School who specializes in international art law, stated that he "would have expected someone of the Baron's sophistication to have undertaken a more diligent search into the provenance of the Painting."

This evidence indicates there is a triable issue of fact whether the Baron was a good faith possessor under Swiss law. Therefore, we cannot affirm the district court's grant of summary judgment on the basis that, as a matter of law, the Baron acquired title to the Painting under Swiss law.[30]

---

[30] The triable issue of fact whether the Baron held the Painting in good faith is another reason TBC cannot establish as a matter of law that the Baron acquired title to the Painting through the 1976 conveyance from the Stephen Hahn Gallery. Even if the Painting was purchased in Switzerland and the conveyance was governed by Swiss law, under Swiss law, only a good faith purchaser can acquire title to a chattel through a conveyance. *See* Swiss Civil Code Article 936 ("A person that

### E.  TBC is not entitled to summary judgment based on its laches defense.

TBC also argues in its cross-appeal of the summary judgment order that the Cassirers' claims are barred by laches.  TBC raises its laches argument under California law.  Since the district court granted summary judgment on the basis of Spanish law, the district court did not consider TBC's laches defense.  As noted above, we also conclude that Spanish law applies.

However, even if California law applied, this Court has stated: "To establish laches a defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.  Because the application of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible to resolution by summary judgment." *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000) (per curiam) (citations omitted).  There is at least a genuine dispute of material fact as to whether any delay was unreasonable.  After the war, Lilly sought physical restitution of the Painting, but her unsuccessful efforts involving litigation lasting a decade ended with the 1958 Settlement Agreement.  Thus, Claude Cassirer could have reasonably believed the Painting was lost or destroyed in the war.

Thus, TBC is not entitled to summary judgment based on its laches defense.

---

has not acquired a chattel in good faith may be required by the previous possessor to return it at any time.").

**F. Lilly's acceptance of the 1958 Settlement Agreement does not foreclose the Cassirers' claims.**

In TBC's appeal of the district court's order denying its motion for summary adjudication on the grounds that Lilly waived her ownership rights to the Painting in the 1958 Settlement Agreement, TBC repeats the same arguments that the district court rejected.  As noted in Part I.A, the 1958 Settlement Agreement was between Lilly, Scheidwimmer (the Nazi art appraiser), Grete Kahn (the heir of the other Jewish victim, Sulzbacher), and the German government. The Settlement Agreement provided that: (1) Germany would pay Lilly 120,000 Deutschmarks (the Painting's estimated value as of April 1, 1956); (2) Grete Kahn would receive 14,000 Deutschmarks from the payment to Lilly; and (3) Scheidwimmer would receive the two German paintings. Grete Kahn expressly waived any right to restitution of the Painting.  However, Lilly did not expressly waive her right to physical restitution.  Instead, as for Lilly, the Settlement Agreement just notes that the settlement settles "all mutual claims among the parties."  The whereabouts of the Painting was unknown, no party possessed it.

Neither party has expressly argued which sovereign's law should be used to interpret the Settlement Agreement. However, the district court applied German law, and the parties do not contest this conclusion on appeal. Accordingly, any choice-of-law issue has been waived, *Martinez-Serrano v. I.N.S.*, 94 F.3d 1256, 1259 (9th Cir. 1996), and we apply German law in interpreting the Settlement Agreement.

TBC argues that Lilly's acceptance of the Settlement Agreement defeats the Cassirers' claims for three reasons. First, TBC argues that Lilly implicitly waived her right to

seek physical restitution when she accepted the Settlement Agreement.  Second, TBC argues the Settlement Agreement remedied and resolved the "taking in violation of international law," and pending litigation of a claim involving a taking is required for FSIA jurisdiction.  Third, TBC argues that federal policy on Nazi-looted art requires honoring the finality of the Settlement Agreement.

In support of its first argument, TBC notes that the Settlement Agreement states that it "settles all mutual claims among the parties."  However, Lilly knew that none of the parties had possession of the Painting or knowledge of its whereabouts, and the agreement purported to settle claims only *among the parties*.  Also, the Settlement Agreement expressly waives Grete Kahn's right to physical restitution, but not Lilly's.

The district court noted that the Bundesgerichtshof (Germany's Supreme Court) recently issued a ruling favorable to the Cassirers' interpretation of the Settlement Agreement.  In that case, the Nazis misappropriated a valuable poster collection belonging to a German Jew, Dr. Sachs.  *Peter Sachs v. Duetsches Historisches Museum,* BGH, Mar. 16, 2012, V ZR (279/10) (Ger.).  In 1961, Dr. Sachs accepted a settlement agreement through the same program that Lilly had used, the Brüg, and Dr. Sachs' settlement agreement stated that it provided "compensation for all claims asserted in this proceeding."  When Dr. Sachs' son discovered the posters still existed and were being held by the German Historical Museum in East Berlin, he sought physical restitution.  The German high court ordered the German Historical Museum to return the poster collection even though Dr. Sachs had accepted his settlement agreement. The German Supreme Court held that Dr. Sachs' claim for physical restitution was not waived by accepting

his settlement agreement because his property was considered lost at the time he accepted the payment. The court also held that Sachs' right to physical restitution was not waived because he had not made an "unambiguous act" renouncing the right.

The *Sachs* precedent is on all fours with Lilly's case. Therefore, Lilly too did not waive her right to physical restitution of the Painting by accepting the 1958 Settlement Agreement. Two other sources of German law support this conclusion. First, Germany's Commissioner of the Federal Government for Matters of Culture and the Media has stated that, for claims of restitution of artwork in which an earlier payment under the Brüg was provided, "earlier compensation payments are not an obstacle to the return of cultural assets, provided that the amount paid earlier is reimbursed[.]" Second, the Cassirers provided a declaration from a German attorney specializing in restitution law who stated his expert opinion that the Settlement Agreement did not waive Lilly's right to physical restitution.

TBC cites to the District Court of Munich's decision acknowledging the 1958 Agreement as evidence Neubauer waived her ownership rights to the painting. But this decision undermines, rather than advances, TBC's argument. The District Court of Munich specifically noted that Lilly "*only waived the restitution claim against Scheidwimmer* as a result of the settlement of 2.28.1958" (emphasis added). Thus, the German court acknowledged that Lilly waived any claims against Scheidwimmer, who was determined not to have possession of the Painting, but it noted that was the only claim Neubauer waived. This further supports our conclusion that Lilly did not waive her right to physical restitution of the Painting.

TBC's second argument is that the Settlement Agreement remedied and resolved the "taking in violation of international law," which means this Court does not have subject matter jurisdiction under the FSIA expropriation exception to sovereign immunity, 28 U.S.C. § 1605(a)(3). This section states that a foreign government's sovereign immunity is abrogated when:

> Rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3).  According to TBC, the Settlement Agreement deprives this court of jurisdiction under the FSIA because the Settlement Agreement provided Lilly compensation for the loss of the Painting, and therefore no right in property is still at issue because the Settlement Agreement resolved the taking in violation of international law.

TBC is wrong because one of the Cassirers' "rights in property taken in violation of international law" remains at issue.  As explained above, the 1958 Settlement Agreement did not extinguish Lilly's right to physical restitution of the Painting.  Therefore, the Cassirers still have a property right (physical restitution) that remains at issue.

TBC's third argument starts from the premise that this Court has recognized that U.S. federal policy favors respecting the finality of appropriate actions taken in foreign countries to restitute Nazi-confiscated artwork.  *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d

712, 721 (9th Cir. 2014). According to TBC, allowing the Cassirers to continue their suit would "disregard" the German restitution proceedings and therefore conflict with federal policy. However, this argument mistakenly assumes Lilly waived her right to seek physical restitution of the Painting when she accepted the Settlement Agreement and that Germany considers the Settlement Agreement to have extinguished her claim to physical restitution.

## G. Spain's Historical Heritage Law does not prevent TBC from acquiring prescriptive title to the Painting.

The Cassirers make yet another new argument on appeal: TBC could not have acquired title to the Painting through acquisitive prescription because of Spain's Historical Heritage Law ("SHHL"). TBC argues that the Cassirers' new argument based on the SHHL is also waived because it too was not argued below. However, this argument is also not waived because this Court may consider pure issues of law on appeal even when not raised below. *Mercury*, 618 F.3d at 992.

The SHHL law creates a comprehensive program for ensuring that cultural artifacts (including buildings, artwork, and archeological artifacts) are maintained in Spain for viewing by future generations of Spaniards. *See* Preliminary Title, General Clauses. The Painting was designated part of Spain's historical heritage in Real Decreto-Ley 11/1993, which also authorized and funded the purchase of the Collection.

Article 28 of the SHHL contains restrictions on the transfer of movable property that is part of the Spanish Historical Heritage. Article 28 has three parts. Article 28.1 states, "Movable property declared of cultural interest and

included in the General Inventory that is in the possession of ecclesiastical institutions . . . may not be transferred, whether with consideration or as a gift, or ceded to individuals or commercial entities. Such property may only be transferred or ceded to the State, to entities that are a creation of Public Law, or to other ecclesiastical institutions." Article 28.2 and 28.3 state:

> 2. Movable property that forms part of the Spanish Historical Heritage may not be transferred by the Public Administration, except for transfers between public administrative entities and as provided for in articles 29 and 34 of this Law.

> 3. The property that this article refers to will not be subject to the statute of limitations. Under no circumstance shall the provisions of Article 1955 of the Civil Code be applied to this property.

According to the Cassirers, SHHL Article 28.3 prevents TBC from using Civil Code Article 1955 to acquire title to the Painting.

The phrase in Article 28.3, "[t]he property that this article refers to" references property described in Article 28.1 and 28.2. Article 28.1 regulates "movable property" that has two qualities. First, that property must be "declared of cultural interest and included in the General Inventory[.]" Second, that property must be "in the possession of ecclesiastical institutions, in any of their facilities or branches[.]" Article 28.1 prohibits ecclesiastical institutions from transferring that property to individuals or commercial entities. Article 28.2 regulates "movable property that forms

part of the Spanish Historical Heritage."    Article 28.2 prohibits public administrations from transferring this property, except via specific transfers authorized by Articles 29 and 34.

Read in context, *Article 28.3 constitutes an additional limitation on the ability of ecclesiastical institutions and state institutions to alienate movable property of Spanish historical heritage*.  Article 28.3 prevents churches or state entities from losing title to historical heritage property through the expiration of the statute of limitations, which confers a substantive right under Spanish law, or through Article 1955 acquisitive prescription.  Therefore, churches and state institutions cannot evade the restrictions on transfer described in Articles 28.1 and 28.2 by allowing a private individual to take possession of the regulated property for the statutory period.  Article 28.3 also preserves public access to historical heritage property in case churches or state administrations carelessly fail to take or maintain possession of that property in a timely fashion.  Since Article 28.3 is designed to prevent churches and state institutions from losing title to historical heritage property, the provision should not be interpreted to prevent TBC, a state institution, from asserting title to the Painting through acquisitive prescription.

## H. The district court correctly found that the application of Article 1955 to vest TBC with title to the Painting would not violate the European Convention on Human Rights.

As a last salvo, the Cassirers argue, "[a]sssuming Spanish law strips the Cassirers' ownership of the Painting, the law is void under Article 1 of Protocol 1 ("Article 1") of the European Convention on Human Rights (the "Convention")."    Spain is a party to the Convention,

including Protocol 1.  The Convention is supreme over Spanish domestic law.  Article 1 of Protocol 1 states:

> Every natural or legal person is entitled to the peaceful enjoyment of his possession.  No one shall be deprived of his possession except in the public interest and subject to the conditions provided for by law and by general principles of international law.

> The preceding provisions shall not, however, in any way impair the right of a State to enforce such laws as it deems necessary to control the use of property in accordance with the general interest or to secure the payment of taxes or other contributions or penalties.

In *Case of J.A. Pye (Oxford) Ltd and J.A. Pye (Oxford) Land Ltd v. The United Kingdom*, 46 EHRR 1083 (2007) ("*Pye*"), a British court had awarded title through adverse possession to land on which the Grahams had grazed their animals for twelve years after the grazing agreement with neighboring real estate developers had expired. *Pye* ¶ 10–22.  The former landowners asked the European Court of Human Rights ("ECHR") to review this decision, and the ECHR, sitting en banc, ruled that the prescriptive acquisition did not violate Article I.  Specifically, the court held that the application of Britain's adverse possession law amounted to a permissible "control of use" of land within the meaning of the second paragraph of Article 1.  *Pye* ¶ 66.  The court also held that this adverse possession law was legitimate and in the "general" (public) interest.  *Pye* ¶ 75.  The court further considered whether the decision struck a fair balance between "the demands of the general interest and the interest of the individuals concerned."  *Pye* ¶ 75.  After considering

many factors, including the fact that English adverse possession laws are long established and support reasonable social policies, the ECHR concluded that the British court decision did strike a fair balance. *Pye* ¶ 75–85. The court noted that "the State enjoys a wide margin of appreciation" in setting rules for its property system unless these rules "give rise to results which are so anomalous as to render the legislation unacceptable." *Pye* ¶ 83.

The district court correctly applied *Pye* and correctly concluded that "Spain's laws of adverse possession do not violate [Article 1]." As in *Pye*, the operation of Spain's acquisitive prescription laws is a permissible "control of use" of property under Article I that serves the general or public interest by ensuring certainty of property rights.

Finally, deciding that TBC has acquired title to the Painting through acquisitive prescription would have struck a "fair balance" between "the demands of the general interest and the interest of the individuals concerned." Admittedly, the *Pye* decision was close (ten to seven), and some of the factors considered by the *Pye* court do not favor TBC's position that Spain's acquisitive prescription laws strike a "fair balance." Nonetheless, Article 1955 is over a century old and supports reasonable social policies, including providing a level of protection for possessors. Spain's acquisitive prescription laws are not so anomalous as to render them unacceptable under the European Convention on Human Rights. But they must be taken as a whole and when one applies Article 1956, as we must, there is a triable issue of fact whether title in the Painting vested in TBC.

## IV.  CONCLUSION

The district court correctly determined that Spain's substantive law determines whether TBC can claim title to

the Painting via acquisitive prescription.  However, we conclude that the district court interpreted Spain Civil Code Article 1956 too narrowly.  An *encubridor* within the meaning of Article 1956 can include someone who, with knowledge that the goods had been stolen from the rightful owner, received stolen goods for his personal benefit.  Since there is a genuine dispute of material fact whether TBC knew the Painting had been stolen when TBC acquired the Painting from the Baron, the district court erred in granting summary judgment in favor of TBC on the basis of Spain's law of acquisitive prescription since the longer period for an *encubridor* to acquire title had not yet run when the Cassirers brought this action for restitution of the Painting.  At the same time, we conclude that TBC's other arguments for affirming the grant of summary judgment that are raised in TBC's cross-appeals are without merit.  Finally, we conclude that the Cassirers' other arguments against applying Article 1955 in this case are without merit.  Given these holdings, we **REVERSE** and **REMAND** to the district court for proceedings consistent with this opinion.